**In re OXFORD HEALTH PLANS, INC., SECURITIES LITIGATION.**

**No. MDL–1222 (CLB).**

United States District Court, S.D. New York.

May 25, 1999.

Jay W. Eisenhofer, Grant & Eisenhofer, P.A., Wilmington, DE, Patricia M. Hynes, Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach, New York City, Martin D. Chitwood, Christi C. Mobley, John O'Shea Sullivan, Chitwood & Harley, Atlanta, GA, Stephen Lowey, Richard B. Dannenberg, Lowey Dannenberg, Bemporad & Selinger, PC, White Plains, for plaintiffs.

Peter J. Beshar, Gibson, Dunn & Crutcher, LLP, New York City, for Steven Wiggins.

Maureen C. Shay, Latham & Watkins, New York City, for Robert Milligan.

Robert J. Giuffra, Jr., Sullivan & Cromwell, New York City, for Oxford, and officer defendants other than Wiggins, Cassidy and Milligan.

Barry H. Berke, Kramer, Levin, Naftalis & Frankel, New York City, for Andrew Cassidy.

Willkie Farr & Gallagher, New York City, for KPMG Peat Marwick.

## MEMORANDUM & ORDER

BRIEANT, District Judge.

Presently before the Court in these cases alleging securities fraud, which have been consolidated for pre-trial purposes,[1] is the motion pursuant to Rule 12(b)(6) and Rule 9(b), Fed.R.Civ.P., of defendant KPMG LLP ("KPMG"). KPMG seeks dismissal of the complaint against it on the

---

1. On April 28, 1998 the Judicial Panel on Multidistrict Litigation filed an order consolidating 52 separate actions in this litigation (38 from the District of Connecticut, 9 from the Southern District of New York, 4 from the Eastern District of New York and 1 from the Eastern District of Arkansas) and transferring them to this Court for pretrial purposes pursuant to 28 U.S.C. § 1407. Five additional cases have since been consolidated under Docket No. MDL–1222. Of the 57 cases, 7 cases are shareholder derivative actions being separately administered by this Court pursuant to the order of the panel, under Docket No. MDL 1222–D. Nothing herein pertains to the derivative actions.

ground that plaintiffs fail to meet the pleading standards of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"). Plaintiffs filed opposition papers on February 19, 1999 and KPMG filed reply papers on April 2, 1999. A hearing was held on April 28, 1999 and decision reserved.

## FACTUAL BACKGROUND

Plaintiffs are persons and entities who allegedly purchased publicly-traded securities of Oxford Health Plans, Inc. ("Oxford") during the period from November 6, 1996 through December 9, 1997 (the "Class Period"). Plaintiffs purport to bring this complaint on behalf of themselves and all others who purchased Oxford securities during the Class Period, as well as on behalf of a sub-class of all persons and entities who purchased Oxford common stock contemporaneously with sales by certain individual defendants during the Class Period.

Defendant Oxford is a managed care company that provides its members in New York, New Jersey, Pennsylvania and Connecticut, with comprehensive health care services on a prepaid basis through a network of medical service providers. The individual defendants were at all times during the Class Period officers and directors of Oxford. Defendant KPMG is a firm of certified public accountants that was Oxford's independent auditor from 1985 to 1998. KPMG conducted an audit of Oxford's financial statements for the fiscal year ended December 31, 1996, and issued a report dated February 18, 1997, opining that Oxford's 1996 financial statements were prepared in accordance with generally accepted accounting principles ("GAAP") and that KPMG's audit was conducted in accordance with generally accepted auditing standards ("GAAS").

Plaintiffs' allegations must be taken as true for purposes of this motion to dismiss. The following facts are thus taken as true: Oxford's press releases and SEC filings during the Class Period contained false or misleading information or omitted material information about the accuracy of Oxford's earnings and enrollment figures and its progress in remedying delays in billing and claims processing associated with a conversion of its computer system. Also during that time, Oxford's financial statements were in violation of GAAP. Between October 27, 1997 and December 9, 1997, Oxford revealed that delays in its ability to collect premiums negatively affected its prior membership, revenue and costs estimates. These disclosures caused the price of Oxford stock to drop substantially.

Plaintiffs allege that in auditing Oxford's 1996 financial statements, KPMG knowingly or recklessly disregarded certain evidence signaling Oxford's accounting irregularities, particularly Oxford's lack of internal controls and ineffective computer system. In so doing, KPMG violated GAAS and other auditing standards.

Specifically, plaintiffs claim that Oxford's 1996 financial statements violated GAAP and were materially misstated because:

(i) Oxford fraudulently recognized and reported premium revenue; (ii) Oxford failed to adequately reserve for uncollectible premiums receivable; (iii) Oxford fraudulently accounted for its RBNP (reported but not paid) and IBNR (incurred but not reported) claims and thereby materially understated its medical costs payable and health care services expense; (iv) Oxford failed to disclose loss contingencies required to be disclosed by GAAP and SEC regulations; and (v) Oxford was unable to quantify its Class Period premium revenue and health care services expense. (Complaint ¶ 213).

Plaintiffs also allege specific violations by KPMG of GAAS General Standards of Reporting, GAAS Field Work Standards, American Institute of Certified Public Accountants ("AICPA") Auditing Standards, and AICPA Statements on Auditing Stan-

dards. These include falsely reporting that Oxford's financial statements were prepared in accordance with GAAP; failing to conduct the audit with independence in mental attitude; conducting the audit without exercising due professional care; failing to make Oxford correct or restate allegedly fraudulent financial statements; failing to plan adequately its audit and supervise the work of assistants; failing to perform audit procedures required to assess the adequacy of Oxford's preparation of financial statements; failing to obtain sufficient understanding of Oxford's control structure and assess Oxford's control risk; failure to evaluate the effect of Oxford's computer processes on the accuracy of financial statements; failing to obtain sufficient competent evidence.

Plaintiffs also allege that there were many "red flags" indicating to KPMG that Oxford's financial reporting systems were in disarray, inherently unreliable and incapable of providing accurate financial statements. In 1996, Oxford's computer conversion was a disaster. Premiums receivable and medical costs payable were ballooning. More than half of all claims logged into Oxford's system were not paid within thirty days. In October 1996, Oracle Corporation ("Oracle"), a computer consulting company, spent two weeks at Oxford and determined that Oxford's computer system was so deficient that Oxford should stop adding functions and related data to it. In December 1996, Oxford had approximately $108 million in suspended claims but could not determine the age of these claims. Oxford was unable to determine how much money it owed to providers and thus began the extraordinary practice of making providers interest-free loans in the form of cash advances. Also, during 1996, the New York Attorney General's Office (the "NYAG") was conducting an investigation of Oxford as a result of member and provider complaints.

In May 1997, the New York State Insurance Department (the "NYSID") announced the results of an unrelated investigation of Oxford's New York subsidiaries. The NYSID had quickly determined after an investigation beginning in 1996 that Oxford's internal controls were severely deficient and had been since 1990. The NYSID concluded that Oxford had not remedied any of the internal control problems found by the NYSID in 1990. As a result of the findings made by the NYSID pursuant to the investigation, the NYSID fined Oxford three million dollars and directed that Oxford increase reserves by millions of dollars, terminate certain management personnel, including the CFO, and remove or replace the two leaders of the KPMG auditing team at Oxford. Also in 1997, Oxford took over one-half billion dollars in total charges relating to the fraudulent activities alleged in the Complaint. When KPMG issued its 1997 audit in early 1998, it reaffirmed the accuracy of its 1996 audit, despite the findings and directives of the NYSID.

Plaintiffs also assert that KPMG had the motive and opportunity to engage in a fraudulent scheme with Oxford because KPMG desired to maintain its competitive position in the industry and to protect and to enhance the fees it received from Oxford.

## DISCUSSION

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all of the well-pleaded facts as true and draw all reasonable inferences from those allegations in favor of plaintiffs. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Dismissal is appropriate only if the plaintiffs can prove no set of facts that would entitle them to relief.

To state a prima facie case under the Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, plaintiffs must allege: (1) a misrepresentation or omission; (2) of material fact; (3) made with scienter; (4) upon which plaintiffs relied; and (5) which

proximately caused plaintiff's injuries. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995). Proper pleading of the scienter element under Rule 9(b) and the PSLRA requires that the plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Our Court of Appeals has interpreted this to require the plaintiff either (1) to allege facts showing that the defendant had both motive and opportunity to commit fraud, or (2) to allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Press v. Chemical Investment Services, Corp.*, 166 F.3d 529, 537–38 (2nd Cir.1999).

*Motive and Opportunity*

 To show motive, plaintiffs must show "concrete benefits [to a defendant] that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Chill v. General Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996). To show "opportunity," plaintiff must show that a defendant had both the means and likely prospect of achieving those concrete benefits. *Id.* at 267 n. 4 (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)).

 Plaintiffs allege that KPMG's motive was to protect and to enhance the fees it received from Oxford, to maintain and to increase its market share for providing accounting services, and to increase income. These generalized economic interests are insufficient to establish motive of an accounting firm to commit fraud. *See Zucker v. Sasaki*, 963 F.Supp. 301, 308 (S.D.N.Y.1997) ("[M]ere receipt of compensation and the maintenance of a profitable professional business relationship for auditing services does not constitute a sufficient motive for purposes of pleading scienter."); *Duncan v. Pencer*, 1996 WL 19043, *10 (S.D.N.Y. Jan. 18, 1996) (finding it "economically irrational" that a large accounting firm "would condone a client's fraud in order to preserve a fee that, at

best, is an infinitesimal percentage of its annual revenues and, by doing so, jeopardize its reputation and license, as well as subject itself to potential damages literally tens of thousands of times as large as its fee"); *see also Shields*, 25 F.3d at 1130 ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.") (citing *Atlantic Gypsum Co. v. Lloyds International Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y.1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent.")).

Plaintiffs do not allege any other motive on the part of KPMG to commit or to participate in the alleged fraud. Therefore, plaintiffs fail sufficiently to plead scienter by facts showing that the defendant KPMG had both motive and opportunity to commit fraud.

*Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness*

Plaintiffs do not allege facts showing that KPMG knowingly participated in the alleged fraud by creating or advising Oxford to create false financial statements, or that KPMG intended its own audit procedures to be insufficient in order to perpetrate the fraud. Rather, plaintiffs allege "in your face facts," (April 28, 1999 Hearing Transcript (Tr.) at 24), that cry out, "how could KPMG not have known that the financial statements were false." Essentially, plaintiffs are alleging that KPMG recklessly disregarded, or outright ignored, blatant evidence of Oxford's extreme accounting irregularities, particularly Oxford's complete lack of internal controls and utterly ineffective computer system. These accounting irregularities obviously indicated that Oxford's financial statements were not and could not have been truthful. In ignoring this evidence, KPMG violated GAAS and other auditing standards and issued a fraudulent audit.

■ In *Chill*, Our Court of Appeals defined reckless conduct for purposes of pleading scienter under Section 10(b):

> Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care ... to the extent that the danger [of misleading buyers or sellers] was either known to the defendant or so obvious that the defendant must have been aware of it. An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness."

*Chill*, 101 F.3d at 269 (internal quotations and citations omitted); *see also SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240–41 (S.D.N.Y.1992). In the context of an audit, it is sufficient to show "that the accounting practices were so deficient that the audit amounted to no audit at all, or [to] an egregious refusal to see the obvious, or to investigate the doubtful." *Price Waterhouse*, 797 F.Supp. at 1240 (internal quotations and citations omitted); *see Ades v. Deloitte & Touche*, 799 F.Supp. 1493, 1499 (S.D.N.Y.1992) "An inference of 'recklessness' satisfying the scienter requirement may be drawn from facts demonstrating conduct that the defendant disseminated material 'knowing [it was] false or that the method of preparation was so egregious as to render [the] dissemination reckless.' " (quoting *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 137 (S.D.N.Y.1989)); *Axel Johnson v. Arthur Andersen & Co.*, 762 F.Supp. 599, 602 (S.D.N.Y.1991); *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 163 (S.D.N.Y.1990).

■ Plaintiffs have alleged that the financial statements did not and could not comply with GAAP; that KPMG violated GAAS in conducting the audit; and that many red flags existed that at least should have caused the auditor to investigate further before issuing its opinion. Although allegations of GAAP and GAAS violations alone are insufficient to create a strong inference of reckless behavior, *see Chill*, 101 F.3d at 270, plaintiffs here allege additional facts showing that there were numerous red flags that KPMG must have been aware of, if it were conducting any kind of audit. The computer *accounting* system was unable to keep track of basic information including membership rolls, accounts receivable and accounts payable. Oracle, a consulting firm, advised Oxford in late 1996 that it should stop inputting accounting background data into the computer system because it could not handle additional functions. The NYSID conducted an investigation beginning in *1996* and later found that *during* 1996, Oxford's internal controls and accounting practices were deficient. Also as a result of the investigation, the NYSID, *inter alia*, fined Oxford three million dollars for regulatory violations and mandated that the CFO of Oxford *and* the leaders of the KPMG auditing team be *removed*. In addition, in 1996, the NYAG was actively investigating Oxford due to the very public complaints of providers who had not been paid. And by early 1997, it had been determined that Oxford's premium revenue and health care services expense were misstated by hundreds of millions of dollars; yet, in 1998, KPMG reaffirmed the accuracy of its 1996 audit.

These allegations, taken together, give rise to a strong inference that when KPMG audited Oxford's 1996 financial statements and issued its clean opinion, it recklessly disregarded or outright ignored the risk of falsity of the 1996 financial statements. As the court held in *In re the Leslie Fay Cos., Inc., Sec. Litig.*, 871 F.Supp. 686 (S.D.N.Y.1995):

> Because [the accountant] was immersed in [the company's] operations while performing its audit, and because the "red flags" would clearly be evident to any auditor performing its duties, one could reasonably conclude that [the accountant] must have noticed the "red flags," but deliberately chose to disregard them to avoid antagonizing [the company] and

incidentally frustrating its fraudulent scheme.

*Leslie Fay,* 871 F.Supp. at 699; *see also In re First Merchants Acceptance Corp. Sec. Litig.,* 1998 WL 781118, *11 (N.D.Ill. Nov.4, 1998) ("[T]he allegations in the complaint, including the magnitude of the misstatements, the specific GAAP and GAAS violations and the 'red flags' together support an inference that Deloitte's audit amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful.") (internal quotations omitted); *In re Health Management, Inc. Sec. Litig.,* 970 F.Supp. 192, 203 (E.D.N.Y.1997) (holding sufficient allegations of GAAP and GAAS violations, the auditor's six-year engagement, the magnitude of the misrepresentations, and the auditors ignorance of red flags); *CMNY Capital, L.P. v. Deloitte & Touche,* 821 F.Supp. 152, 165 (S.D.N.Y.1993) (holding sufficient allegations of GAAS violations and red flags including fictitious sales being included as revenue, unusually high year end revenues, and the existence of large and unusual transactions); *Ades,* 799 F.Supp. at 1501 (holding sufficient allegations of accounts receivable including undelivered or consigned goods, length of time that invoices had been outstanding, documents in accounting firm's possession and admissions by firm personnel).

## CONCLUSION

Plaintiffs plead scienter adequately by pleading strong circumstantial evidence of conscious misbehavior or recklessness. The Court has considered all other contentions of KPMG and finds them without merit. For the foregoing reasons, KPMG's motion to dismiss is denied.

SO ORDERED.