**In re QUINTEL ENTERTAINMENT INC. SECURITIES LITIGATION.**

**No. 98 Civ. 3163 WCC.**

United States District Court, S.D. New York.

Oct. 25, 1999.

Wolf Popper LLP, Chair of the Executive Committee of Plaintiffs' Counsel, New York City, NY, Robert M. Kornreich, Robert C. Finkel, of counsel and Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Andrew N. Friedman, of counsel and Garwin, Bronzaft, Gerstein & Fisher, L.L.P., New York City, NY, Scott W. Fisher, of counsel and Milberg Weiss Bershad Hynes & Lerach LLP, New York City, NY, Janine L. Pollack, Elaine S. Kusel, of counsel, Members of the Executive Committee of Plaintiffs' Counsel.

Bernstein Liebhard & Lifshitz, New York City, NY, for plaintiffs, Michael S. Egan, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, NY, for defendants, Fredric W. Yerman, Phillip A. Geraci, Mirit Steiger, of counsel.

WILLIAM C. CONNER, Senior
District Judge.

This class action lawsuit is brought by plaintiffs on behalf of all persons or entities who purchased common stock of Quintel Entertainment ("Quintel") during the period July 15, 1997 through October 15, 1997 (the "Class Period"). The Consolidated and Amended Class Action Complaint ("Complaint") alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The Complaint also alleges that numerous individual defendants are liable pursuant to Section 20(a) of the Exchange Act. The action is currently before the Court on defendants' Motion to Dismiss pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

## BACKGROUND

These facts are drawn from plaintiffs' Complaint and are accepted as true for the purposes of the motion to dismiss. *See In re AES Corp. Sec. Litig.,* 825 F.Supp. 578, 583 (S.D.N.Y.1993).

Defendant Quintel is a corporation that, during the Class Period, was in the business of developing and marketing telephone entertainment services, consisting primarily of live conversation and pre-recorded horoscopes, tarot card readings and live psychic consultations. *See* Compl. ¶ 12. Quintel also provided voice mail services. ("VM Product").

Defendant Jeffrey L. Schwartz ("Schwartz") was Quintel's Chairman, Chief Executive Officer, and Secretary/Treasurer during the Class Period. Defendant Daniel Harvey ("Harvey") joined Quintel in September 1996 and became its Chief Financial Officer in January 1997. Defendant Jay Greenwald ("Greenwald") was President, Chief Operating Officer, and a director of Quintel during the Class Period. Defendant Claudia Newman Hirsch ("Hirsch") was Executive Vice President and a director of Quintel during the Class Period. Defendant Andrew Stollman ("Stollman") was Senior Vice President, Secretary and a director of Quintel during the Class Period. Defendants Greenwald, Hirsch, and Stollman received compensation based, in part, on Quintel's reported financial performance. Defendants Mark Gutterman ("Gutterman") and Michael G. Miller ("Miller") were directors of Quintel during the Class Period. Finally, Defendant Steven L. Feder ("Feder") was both a director and employee of Quintel during the Class Period. *See* Compl. ¶¶ 13–20. Defendants Schwartz, Harvey, Greenwald, Hirsch, Stollman, Gutterman, Feder and Miller are referred to herein as the "individual defendants."

Quintel's entertainment services, accessed by dialing "900" telephone numbers, allowed callers to receive live psychic or tarot card readings. These live services were billed at $3.99 to $4.99 per minute, with the first two to five minutes free to the customer. Quintel's live conversation "900" services accounted for about 76% and 67% of Quintel's net revenues for the fiscal years ending November 30, 1996 and 1997 respectively. *See* Compl. ¶ 37. Quintel billed and collected for the "900" number calls through the use of service bureaus and local and long distance companies. Quintel recognized the revenues from these calls at the time a customer made a billable call. These recognized revenues were net a provision for customer "chargebacks," which included refunds, credits and uncollectible amounts. The reserve for chargebacks was estimated based on chargeback history updated on a monthly basis. *See* Compl. ¶ 39.

Quintel entered into a marketing agreement with AT & T in 1996 (the "AT & T partnership"), whereby Quintel offered psychic products and subscription services as an incentive for customers to switch their long distance service to AT & T. *See* Compl. ¶ 44.

Three months prior to the Class Period, defendants issued a series of public statements regarding the growth and financial strength of Quintel. On April 14, 1997, Quintel, through Schwartz, reported first quarter fiscal 1997 revenues of $44,059,812, an increase of 175% over net revenues for the first quarter in 1996. Schwartz also reported net income of $5,435,397, or $0.29 per share, an increase of 26% over the comparable period in 1996. Schwartz attributed the increase in revenues to Quintel's diversification into the marketing of telecommunications products and services. These financial results were incorporated into Quintel's Form 10–Q filed on April 14, 1997 and signed by Schwartz and Harvey. *See* Compl. ¶¶ 45–9.

The April 14, 1997 Form 10–Q also stated that the provision for chargebacks as a percentage of gross revenues was reduced from 38% for the three months ended February 29, 1996 to about 25% for the three

months ended February 28, 1997. This reduction was due to the decrease in chargebacks relating to the "900" entertainment services resulting from customer service modifications instituted by one of Quintel's service providers. *See* Form 10–Q, April 14, 1997.[1]

During a meeting with analysts on April 21, 1997, Schwartz commented that Quintel's ability to convert a customer from an inquiry to a paid caller had improved as the result of improved technology in their billing system. Schwartz and Harvey also explained that the chargeback rate had been reduced because of the formation of two customer service centers dedicated to the 900 business. Schwartz also noted that Quintel's partnership with AT & T was "unique" and "the most exciting partnership that [AT & T] has entered into since they began their strategic marketing program." *See* Compl. ¶¶ 51–4.

Several business publications also quoted defendants as making optimistic statements about Quintel's growing success. *See* Compl. ¶¶ 56–9.

Immediately prior to the Class Period, Quintel's common stock was trading at an all time high of $14.625 per share on July 14, 1997. *See* Compl. ¶ 59.

On July 15, 1997, Quintel's financial results for the second quarter of fiscal 1997 were set forth in its Form 10–Q, signed by defendants Schwartz and Harvey, and in a press release on that same day. The Form 10–Q stated Quintel's partnership with AT & T accounted for 24% of the increase in the prior year's net revenues. *See* Compl. ¶ 61. Also, the provision for chargebacks as a percentage of gross revenues was down from 43% in the prior year's second quarter to 28% for the second quarter of fiscal 1997. *See id.*

Soon after the announcement of Quintel's favorable financial results, the individual defendants sold over 730,000 shares of the Quintel stock that they owned for a collective profit of about $10 million. *See* Compl. ¶¶ 13, 15–20, 64–5. Defendant Schwartz sold 165,000 shares during the Class Period and realized aggregate proceeds of over $2.3 million. Defendant Greenwald sold 135,000 shares of Quintel common stock and realized $1,890,000. Defendant Hirsch sold 90,000 shares during the Class Period for proceeds of $1,260,000. Defendant Stollman sold 50,000 shares of Quintel common stock and realized $700,000. Defendant Gutterman sold 10,000 shares of Quintel common stock during the Class Period, realizing $138,880. Defendant Miller sold 112,500 shares of Quintel common stock for proceeds of $1,576,210. Defendant Feder sold 54,500 shares and realized $758,020. These sales accounted for approximately 48.8% of Quintel's trading volume during the seven trading days from July 18, 1997 through July 28, 1997. The total of 730,000 shares sold by the individual defendants during the Class Period represented a 156% increase over the total insider sales for the 14–month period prior to the start of the Class Period.

On August 24, 1997, the *Miami Herald* published a news article stating that customers were being wrongfully induced to call Quintel's "900" numbers by false representations of free psychic readings. *See* Compl. ¶¶ 66–73. Complaints to state attorneys general were "pouring in" from all over the country.

In an October 7, 1997 press release, Quintel announced that its earnings for the third quarter of fiscal year 1997 would decline from both the second quarter of that year and the third quarter of fiscal year 1996. The decline in earnings was attributed to a higher incidence of customer chargebacks for its telecommunications entertainment programs. *See* Compl. ¶ 74.

---

1. In deciding a Motion to Dismiss, this Court may consider any document the complaint incorporates by reference. *See Goldman v. Belden,* 754 F.2d 1059, 1065–66 (2d Cir. 1985). Therefore we may consider part of the Form 10–Q that may not be specifically cited in the Complaint.

On October 8, 1997, Quintel shares fell 1 7/16 to 8 15/16. *See* Compl. ¶ 75.

On October 15, 1997, Quintel announced in a press release and its Form 10–Q the third quarter results for fiscal year 1997. Net income was $0.01 per share, as compared to $0.20 per share for the comparable period in 1996. Net revenues were $44,688,568, compared to $17,493,179 in the third quarter of fiscal year 1996. Schwartz commented that: "During and subsequent to the third quarter we received information from our providers indicating a substantial increase in the rate of chargebacks, resulting in an under-reserve for prior periods and causing an increased chargeback rate for the current period." Compl. ¶ 76.

The October 15, 1997 press release also indicated that AT & T modified its contract with Quintel during the quarter ended August 31, 1997. AT & T's limitation of Quintel's marketing efforts led to reductions in revenue for the quarter.

Quintel filed its Form 10–Q for the third quarter of fiscal year 1997 with the Securities and Exchange Commission ("SEC") on October 16, 1997. The provision for chargebacks increased from 35% in the third fiscal quarter of 1996 to 44% in the comparable period of 1997. The third quarter Form 10–Q attributed the increase of the provision for chargebacks to information Quintel received during the quarter ending August 31, 1997 about a significant increase in the rate of "900" service chargebacks. *See* Compl. ¶ 79.

The third quarter Form 10–Q also commented upon AT & T's modification of its contract with Quintel, stating that the adjustment was "commenced in late July 1997."

On October 15, 1997, Quintel common stock was trading at $7.75 per share, or less than half of its Class Period high of $15.625 per share.

**2.** Section 10(b) of the Securities Exchange Act of 1934 states in relevant part:

According to its Form 10–K for fiscal year ended November 30, 1997, Quintel used several companies to provide billing and collection services in connection with its telephone entertainment services and "900" numbers. One of these companies, West TeleServices Corporation ("West"), provided Quintel with reports that included the amount of money received for "900" calls in each month and the chargeback initially charged for each month. Quintel would then use this information to project eventual chargebacks within a given financial period. As of July 15, 1997, Quintel would have received from West reports of the chargebacks for December 1996 through May 1997. *See* Compl. ¶¶ 102–03.

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), the issue is "whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). The Court must accept all of the well-pleaded facts as true and consider those facts in the light most favorable to the plaintiffs. *See id.*

Defendants move to dismiss on the grounds that (1) plaintiffs have failed to state a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder; (2) plaintiffs have failed to meet the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA; and (3) plaintiffs failed to state a claim for control person liability under § 20(a).

### I. *Failure to State a Claim under § 10(b) and the PSLRA*

To state a prima facie case under § 10(b) and Rule 10b–5 promulgated thereunder,[2] plaintiffs must allege: a ma-

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or

terial misrepresentation or omission; made with scienter; upon which plaintiffs relied; and which proximately caused plaintiff's injuries. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995). Because the Complaint alleges fraud, Rule 9(b) heightens the pleading requirements and requires that "the circumstances constituting fraud or mistake shall be stated with particularity." ·Fed.R.Civ.P. 9(b). Also, the PSLRA requires that plaintiffs specify each alleged misleading statement and explain why it is misleading. The Second Circuit has interpreted Rule 9(b) and the PSLRA as requiring the complaint to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 51 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). Therefore, when considering whether plaintiffs have stated a prima facie case, we do so in light of the particularity requirements of Rule 9(b).

### A. *Material Misrepresentation or Omission*

Plaintiffs allege the following misrepresentations or omissions in the Complaint:

(1) The July 15, 1997 press release concerning Quintel's financial reports for the second quarter of fiscal year 1997 and the Form 10–Q filed on that same day ("the July 1997 re-

ports") were false and misleading when made.

(2) Even if the July 1997 reports were not false, defendants should have made a corrective disclosure when they learned that the reports were misleading.

(3) Defendants' financial reports during the Class Period were false and misleading because defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material unfavorable impact on net revenues or income and the reports were not in conformity with Generally Accepted Accounting Practices (GAAP).

■ In response, defendants, in their Motion to Dismiss, first argue that plaintiffs are relying on statements made before the Class Period to establish a prima facie § 10(b) violation. Although defendants are correct in that they are "liable only for those statements made during the class period," *In re Intern. Business Machines Corporate Sec. Litig.*, 163 F.3d 102, 107 (2d Cir.1998), the Complaint's recitation of statements made before the Class Period does not require dismissal. Plaintiffs allegations include misrepresentations and omissions made during the Class Period. The Class Period is July 15, 1997 through October 15, 1997, and plaintiffs allege that statements made on July 15, 1997 were false and misleading and that from that date until October 15, 1997, de-

of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j.
Rule 10b–5 states in relevant part:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce,

or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

fendants failed to make a corrective disclosure. Further, statements made prior to the Class Period are relevant in determining whether defendants had a duty to make a corrective disclosure during the Class Period.

### 1. *July 15, 1997 Press Release and Form 10–Q*

█ The Complaint sufficiently alleges what the material misrepresentations were, who made them, and when and where they were made. Plaintiffs specify that the statements made by defendants Schwartz and Harvey on July 15, 1997 in the press release and Form 10–Q were false. The Complaint alleges· that at the time that the July 1997 reports were made, defendants knew, or should have known, that the statements about a decrease in chargebacks were false and misleading. First, defendants knew, or were reckless in not knowing, that there was "rampant customer dissatisfaction" because there were numerous complaints lodged with state attorneys general about the "900" services. In addition, the West reports made Quintel aware of the increasing amount of the chargebacks. Defendant Schwartz later admitted in Quintel's October 15, 1997 press release that *"during and subsequent to the third quarter* we received information from our providers indicating a substantial increase in the rate of chargebacks . . ." (emphasis added). The third quarter began on June 1, 1997. To the extent that defendants received this information between June 1 and July 15, 1997, the July 1997 reports were false and misleading. Taking as true the allegations of the Complaint, they furnish ample support for the charge that the statements in

the July 1997 reports indicating that the chargebacks had significantly decreased were false and misleading.[3]

In addition, defendants' Form 10–Q continued earlier representations that its partnership with AT & T accounted for significant increases in net revenues. The July press release indicated that "revenues generated from diversification into new areas of direct response is growing." Quintel then indicated in its October 1997 Form 10–Q that during the three-month period ending August 31, 1997, AT & T had modified its partnership with Quintel and "severely limited the customer base to which [Quintel] could market AT & T's long distance products". The Complaint alleges that because Quintel knew that AT & T was modifying their partnership during June, July, and August of 1997, the July 1997 reports were false and misleading as to the success of the AT & T–Quintel strategic partnership and the diversification of Quintel's business. The Complaint puts forth sufficient evidence that these statements were false and misleading, and indicates with sufficient particularity who made the statements and when and where the statements were made.

### 2. *Failure to Make a Corrective Disclosure*

█ Plaintiffs have also pleaded with particularity a claim that defendants should have made a corrective disclosure when they learned that customer chargebacks had been understated and AT & T was scaling back its partnership with Quintel. A duty to update prior statements "may exist when a statement, reasonable at the time it is made, becomes misleading

---

**3.** Defendants state in their Motion to Dismiss that "the heart of plaintiffs' claims is that Quintel allegedly told that public that, through "controlled marketing and increased customer service support," it had immunized itself from unexpected chargebacks in all of its product lines." Defendants argue that the statements in July 15, 1997 Form 10–Q indicating that Quintel had the ability to monitor chargeback experience through improved cus-

tomer service related only to its VM Product, and not to its "900" services. Even if this is true, defendants made other positive comments about the amount of the chargebacks in their July 1997 reports which could have been misleading if considered in light of the other allegations that Quintel knew about increasing customer dissatisfaction and chargebacks during the third quarter of fiscal year 1997.

because of a subsequent event." *In re IBM Corporate Secs. Litig.*, 163 F.3d at 110 (citing *In re Time Warner Inc. Securities Litig.*, 9 F.3d 259, 267 (2d Cir.1993) ("*Time Warner*")). However, there is no duty to update mere expressions of opinion or exclusively forward-looking statements. *See id.*

 The Complaint must adequately allege that defendants knew or should have known their statements became misleading. In *Ross v. A.H. Robins Co.*, the Second Circuit upheld the District Court's dismissal of a § 10(b) claim where shareholder/plaintiffs filed suit against a pharmaceutical manufacturer and several of its directors alleging that the defendants artificially inflated the price of the corporation's common stock by their failure to reveal information regarding the safety and effectiveness of a product. 607 F.2d 545, 558 (2d Cir.1979). However, the complaint in *Ross* failed to adequately allege whether the defendants learned that the product was unsafe during the class period. *See id.* at 558. In contrast, the complaint in *Acito* alleged that the defendant learned during the Class Period that contrary to a previous statement, one of its manufacturing plants was not coming on line. *Acito,* 47 F.3d at 53. Like the plaintiffs in *Acito,* plaintiffs here specifically alleged that because of Quintel's statement in its October 15, 1997 Form 10–Q that in the three months prior to August 31, 1997 AT & T scaled back its partnership and chargebacks increased, defendants knew or were reckless in not knowing that their earlier statements about decreased chargebacks and the success of the AT & T partnership were misleading.

The statements made by defendants both prior to and during the Class Period were not vague, forward-looking expressions of optimism.[4] In *In re Intern. Business Machines Corporate Securities Litig.*, plaintiffs alleged that IBM had a duty to correct its earlier statements that its dividend was secure and it "had no real plan, no desire, and [saw] no need to cut the dividend." 163 F.3d at 107. The court found that the statement and other similar statements were vague, forward-looking expressions of optimism that "were not sufficiently concrete, specific or material to impose a duty to update." *Id.* at 110. In *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.* ("*San Leandro*"), the court upheld the dismissal of a claim that Philip Morris had the duty to disclose an alternative marketing plan because the previous statement by a Philip Morris representative could not "have left any reasonable investor to conclude that Philip Morris had committed itself to a particular marketing strategy and had foreclosed all alternatives." 75 F.3d 801, 810 (2d Cir.1996). In contrast, there was a duty to disclose in *Time Warner,* where Time Warner "publicly hyped strategic alliances" as a way to raise capital and then changed its plan to include a variable price offering instead. 9 F.3d at 268. Unlike the challenged statements in *In re Intern. Business Machines Corporate Secs. Litig.* and *San Leandro,* the statements that the AT & T strategic partnership was contributing to increased net revenues and chargebacks were decreasing were statements of existing facts, not predictions. Like *Time Warner,* Quintel "publicly hyped" its "unique" and "excit-

---

4. A "forward-looking" statement includes any statement containing a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items; any statement of the plans and objectives of management for future operations; and any statement of future economic performance. *See* 15 U.S.C. § 78u–5(i)(1). Defendants' statements in the Form 10–Q filed on July 15, 1997 were not forward-looking because they involved the representa-

tion of existing facts concerning the number of chargebacks and the value of the AT & T partnership. To the extent that the statements made in the July 15, 1997 press release were forward-looking because they indicated continuing diversification and growth, Quintel is not protected from liability under the "safe harbor" provision in § 78u–5(c)(1)(A) because the press release was not "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u–5(c)(1)(A).

ing" partnership with AT & T, as well as its success in decreasing chargebacks; therefore there was a duty to disclose when Quintel received information that rendered that hype misleading.

### 3. Violations of SEC Reporting Regulations and GAAP

Plaintiffs also allege that defendants' financial reports during the Class Period were false and misleading because defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material unfavorable impact on net revenues or income and the reports were not in conformity with Generally Accepted Accounting Practices ("GAAP"). Item 303 of SEC Regulation S–K requires management to:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation.

17 C.F.R. § 229.303(a)(3).

■ Although the SEC has concluded that when companies violate Item 303 of SEC Regulation S–K, they often violate § 10(b) as well, see In the Matter of Valley Sys., Inc., File No. 3–8811, 1995 WL 547801, at *4 (S.E.C. Sept. 14, 1995), violations of Item 303 do not necessarily create a private cause of action. See In re Sofamor Danek Group, Inc., 123 F.3d 394, 402 (6th Cir.1997). Violations of Item 303 may be relevant to determining when a false or misleading omission has been made, "it is far from certain that the requirement that there be a duty to disclose under Rule 10b–5 may be satisfied by importing the disclosure duties from S–K 303." In re Canandaigua Securities Litig., 944 F.Supp. 1202, 1209 n. 4 (S.D.N.Y.1996) (withholding decision on the relationship between S–K 303 and 10b–5 actions because of finding that there was no duty to disclose under S–K 303); see also Alfus v. Pyramid Tech. Corp., 764 F.Supp. 598,

607–08 (N.D.Cal.1991) ("demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. Such a duty to disclose must be separately shown."); In re Sofamor Danek Group, 123 F.3d at 402 (finding the argument that defendants' disclosure duty under Rule 10b–5 claim may stem from Item 303 unpersuasive). In light of the absence of authority for the position that a failure to comply with the disclosure duties under Item 303 can be the basis of a § 10(b) action, this Court refuses so to hold. To the extent that plaintiffs' § 10(b)(5) claim is based only upon alleged violations of the Item 303 of SEC Regulation S–K, it must be dismissed for failure to state a claim.

■ Plaintiffs also allege that the financial reports that defendants' issued during the Class Period were false and misleading because the reports violated GAAP. Compl. ¶¶ 109–13. Although "allegations of a violation of GAAP provisions, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim," SEC v. Price Waterhouse, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992), if the Complaint alleges additional evidence of intent, a violation of GAAP may be the basis of a § 10(b) claim. The Complaint explains why the reports were false and misleading by stating with particularity each provision of GAAP that defendants allegedly violated. These allegations sufficiently plead that the financial reports were false or misleading statements, subject to the requirements of materiality and scienter, discussed below.

### B. Materiality

■ Our inquiry does not end upon finding that plaintiffs have alleged with sufficient particularity a number of false or misleading statements or omissions. A misrepresentation or omission is material and actionable under § 10(b)(5) "if there is a substantial likelihood that a reasonable

shareholder would consider it important in deciding how to [act]." *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). But plaintiffs do not have to show that the misrepresentation or omission would have been outcome-determinative. *See TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Materiality is "generally particularly well-suited for jury determination," thus this Court will dismiss a complaint on materiality grounds only if reasonable minds could not differ on the importance of the information to the reasonable investor. *In re Kidder Peabody Secs. Litig.,* 10 F.Supp.2d 398, 409 (S.D.N.Y.1998) ("Kidder Peabody").

First, as a general proposition, profit statements and financial reports are of particular interest to investors. *See id.* at 410. The court in *Kidder Peabody* refused to hold that misstatements of profits in financial reports were immaterial as a matter of law because of the impact that the misstatements would have on the reputation of the company. *Id.* at 411. Here, the alleged misstatements or omissions involve, in part, Quintel's Form 10–Q. Quintel's financial reports, like the Form 10–Q, would be of particular interest to investors.

The source of the alleged misstatements and omissions is also relevant. In *Benjamin v. Kim,* the court found that representations by a Chief Executive Officer ("CEO") and Director that their corporation was financially healthy and growing were material because a reasonable investor would have considered the statements of the CEO or Director significant in determining whether to invest. No. 95 CIV. 9597, 1999 WL 249706, at *7 (S.D.N.Y. April 28, 1999). Similarly, in this case the July 1997 press release was made by Schwartz, Quintel's Chairman, CEO and Secretary/Treasurer at that time. The July 1997 Form 10–Q was signed by Schwartz and Harvey, who was Quintel's Chief Financial Officer at that time. Just as the statements by the CEO in *Benjamin* were material, statements by Quintel's CEO and Chief Financial Officer that discussed net profits, provisions for chargebacks, and financial growth attributable to the strategic partnership with AT & T, would be considered by a reasonable investor in deciding whether to purchase Quintel common stock.

Defendants argue that the statements made in reference to Quintel's partnership with AT & T are immaterial because they were mere "puffery." However, in *Robbins v. Moore Med. Corp.,* the plaintiffs alleged that defendants presented a picture of a company that was "essentially healthy but for a few problems whose imminent correction would result in greater profitability" despite the fact that the company had significant problems, and the court refused to dismiss plaintiffs' claims for immateriality. 788 F.Supp. 179, 184 (S.D.N.Y.1992). In contrast, the Second Circuit in *San Leandro* agreed with the court below that statements by defendant Philip Morris representatives that the company "should deliver income growth consistent with its historically superior performance," were puffery and "relatively subdued comments." *San Leandro,* 75 F.3d at 811. In this case, the challenged statements specifically referred to reduced provision for chargebacks and significant increases in net revenue attributed to Quintel's partnership with AT & T. Unlike the vague statements of subdued optimism in *San Leandro,* the statements made by defendants here cite specific areas of financial strength. Like the defendants in *Robbins,* defendants painted a rosy picture of Quintel's financial health, citing an increase of 880% in net income for the second quarter of fiscal year 1997 compared to the same quarter in fiscal year 1996, while allegedly omitting information about significant problems with increasing chargebacks, customer dissatisfaction, and AT & T's scaling back of its partnership. Because the alleged false and misleading statements and omissions are more than mere "puffery," the allegations cannot be dismissed for immateriality.

## C. *Scienter*

 Although Rule 9(b) relaxes the particularity requirements for pleading scienter by providing that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," the PSLRA requires that the plaintiff "allege facts that give rise to a strong inference of fraudulent intent." 15 U.S.C. § 78u–4(b)(2). The Second Circuit has repeatedly held that a complaint may establish the "strong inference" of fraudulent intent either by (1) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) by alleging facts to show that the defendants had both motive and opportunity to commit fraud. *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 83 (2d Cir.1999); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994); see *also In re Health Management, Inc. Securities Litig.*, 970 F.Supp. 192, (E.D.N.Y.1997) (cases that reject the motive and opportunity test for scienter are "inapposite" because if Congress wanted to impose a requirement of knowing behavior, it could have done so).

### 1. *Conscious Misconduct or Recklessness*

 Under securities laws, recklessness includes "highly unreasonable" conduct which represents "an extreme departure from the standards of ordinary care." *Benjamin*, 1999 WL 249706, at *8. Plaintiffs have alleged that defendants knew or were reckless in not knowing that the statements made in the July 1997 press release and the Form 10–Q were false and misleading. The Complaint alleges that because of the increasing customer complaints about Quintel's "900" entertainment services, various state attorney general investigations, and the West reports on chargebacks, defendants knew or should have known that the positive statements made during the Class Period about decreasing chargebacks were false and misleading. The Complaint also alleges that if AT & T began to scale back its partnership in July 1997, defendants knew or were reckless in not knowing that their positive statements during the Class Period about the AT & T partnership were false or misleading.

In *In re Oxford Health Plans, Inc. Securities Litig.*, an accounting firm ignored evidence of a company's irregular accounting practices when conducting an audit of that company, and recklessly disregarded the risk of falsity of financial reports. 51 F.Supp.2d 290, 295 (S.D.N.Y.1999) (*"Oxford Health Plans "*). Similarly, in *Kidder Peabody*, defendants knew or were reckless in not knowing that a trader-employee was reporting false profits because the nature of the trader's transactions was clear from open internal records and officials directed the trader to manipulate the balance sheet. 10 F.Supp.2d at 415. In contrast, where plaintiffs only alleged that defendants violated GAAP and announced optimistic financial results and later made a retroactive announcement of lowered earnings, plaintiffs failed to plead sufficient recklessness or knowledge to establish scienter. *See Stevelman*, 174 F.3d at 84–5. Although plaintiffs here fail to allege such extreme circumstances as the trader openly reporting false profits in *Kidder Peabody*, the facts adequately allege that defendants knew that chargebacks were increasing and that AT & T was scaling back its partnership and recklessly allowed false and misleading statements to be made to the public regarding both the chargebacks and the AT & T partnership. Like the auditors in *Oxford Health Plans*, defendants here are alleged to have recklessly disregarded obvious signs that the financial reports were misleading, such as the West reports indicating increased chargebacks, and notification from AT & T about scaling back of its partnership with Quintel. Considering the allegations in the light most favorable to the plaintiffs, they adequately state facts creating a strong inference of fraudulent intent.

## 2. *Motive and Opportunity*

In the alternative, plaintiffs may prove scienter by showing that the defendants had the motive and opportunity to commit fraud. First, to show opportunity, plaintiff must allege that a defendant had both the means and likely prospect of achieving concrete benefits from making false statements or omissions. *See Oxford Health Plans*, 51 F.Supp.2d at 293. In *Time Warner*, it was beyond doubt that the defendants, principals in the Time Warner corporation, had the opportunity to manipulate the price of stock. 9 F.3d at 268. Similarly, in *In re Hudson Techs., Inc. Securities Litig.*, the court found that the company's President, CEO, Chairman, Executive Vice President, Corporate Secretary, Treasurer and directors all had the power to influence public disclosures, and thus the opportunity to commit fraud. No. 98 CIV. 1616, 1999 WL 767418 (S.D.N.Y. Sept.28, 1999) (*"Hudson Techs."*). Just as the corporate principals in *Time Warner* and *Hudson Techs.* had the opportunity to commit fraud, defendants here, Quintel and its corporate principals, had the opportunity to commit fraud through control of the public disclosures.

Second, motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *Shields*, 25 F.3d at 1130. Plaintiffs allege two motives: (a) protection and enhancement of defendants executive positions and the compensation they obtained as a result of those positions; and (b) inflation of the price of Quintel common stock so as to allow for profitable insider sales. Compl. ¶¶ 115–16.

Compensation based in part on the value of a company's stock does not give rise to a strong inference of scienter. *See Acito*, 47 F.3d at 53. Plaintiffs must do more than allege that "executives aim to prolong the benefits of the positions they hold." *Shields*, 25 F.3d at 1129. *But see Kidder Peabody*, 10 F.Supp.2d at 418 (finding adequate pleading of scienter where plaintiffs submitted evidence that defendants received substantial bonuses based upon reported profits). Defendants' motive to protect their compensation and executive positions is insufficient to show scienter.

Plaintiffs also allege that defendants' motive for making false and misleading statements was to inflate the price of Quintel stock and then make significant profits from insider sales of Quintel stock. In the Second Circuit, only "unusual" insider trading activity may permit an inference of bad faith and scienter. *See Acito*, 47 F.3d at 54. In *Acito*, only one corporate insider sold his personal stock, and he only sold 11% of his holdings during the Class Period. *Id.* (finding that facts alleged did not give rise to strong inference of intent to deceive). Similarly in *Hudson Techs.*, the plaintiffs failed to allege that defendants' stock sales of 4,100 shares each out of 270,000 total shares were unusual. 1999 WL 767418, at *9. In contrast, several of the corporate officers in *Stevelman* sold off large portions of their stock holdings while making optimistic statements about the corporation's financial position, and the court found that the sales were unusual insider trading that permitted an inference of bad faith and scienter. 174 F.3d at 85. Here, defendants Schwartz, Greenwald, Hirsch, Stollman, Gutterman, Miller and Feder all sold a portion of their personal stock holdings during the Class Period. These sales accounted for almost one-half of Quintel's trading activity during one week of the Class Period and represented a 156% increase over total insider sales for fourteen months prior to the start of the Class Period. Given the number of corporate insiders that made sales and the relative volume of those sales, the insider trading in this case is more like that in *Stevelman* than the sales of a singular corporate officer in *Acito* and *Hudson Techs.* For the purposes of this Motion to Dismiss, plaintiffs have alleged sufficient evidence of unusual

insider trading to establish defendants' motive for making false or misleading statements. Plaintiffs have alleged facts to support a finding of scienter based upon either recklessness and conscious misbehavior or motive and opportunity.

### D. *Reliance*

■ Plaintiffs proceed under a "fraud on the market" theory, and do not have to prove reliance. The fraud on the market theory is that in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company. Because the misleading statements can affect the price of the company's stock, the statements will defraud purchasers of stock even if they do not directly rely on the misstatements. *See Basic*, 485 U.S. at 241–42, 108 S.Ct. 978. Based on this notion of an efficient market, the fraud on the market theory permits "a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market." *Securities Investor Protection Corp. v. BDO Seidman*, 49 F.Supp.2d 644, 656 (S.D.N.Y.1999) (citations omitted). Plaintiffs here do not have to prove reliance because the market for Quintel stock was an efficient market, and plaintiffs can proceed under a fraud on the market theory.

### E. *Causation*

■ Plaintiffs have the burden of proving that defendants' false and misleading statements or omissions caused the losses for which they seek to recover. *See* 15 U.S.C. § 78u–4(b)(4). For a claim under § 10(b)(5), causation involves both transaction causation and loss causation. Plaintiffs have adequately pled transaction causation, also known as reliance or "but for" causation, by proceeding under the "fraud on the market" theory, as discussed above.

The standard for loss causation is similar to that of proximate causation in the context of tort law. Plaintiffs must allege and prove that their loss was caused by financial problems concealed by defendants' misleading statements. *See AUSA Life Ins. Co. v. Ernst & Young*, 991 F.Supp. 234, 249 (S.D.N.Y.1997) (J. Conner).

■ The Complaint in this case alleges that plaintiffs suffered damages by purchasing Quintel common stock at inflated prices during the Class Period. Compl. ¶ 126. Plaintiffs allege that as a result of defendants' misstatements and omissions, they were induced to purchase Quintel common stock. Also, the price for Quintel stock was artificially inflated, causing plaintiffs to purchase stock during the Class Period at an artificially high price. Plaintiffs allege they later suffered financial losses when the stock price fell to less than half of its Class Period high. Defendants should have reasonably foreseen that their alleged misstatements and omissions during the Class Period would artificially inflate the stock price because the statements were unduly optimistic about Quintel's financial success. Defendants also should have reasonably foreseen that the stock price would fall upon revelation of the increased chargebacks and scaling back of the AT & T partnership. Taken as true, these facts adequately allege that defendants' misstatements and omissions were the proximate cause of plaintiffs' financial losses.

### II. *Failure to State a § 20(a) Claim for Control Person Liability*

■ Section 20(a) of the Securities Exchange Act of 1934 provides for individual liability for every person who "directly or indirectly, controls any person liable under [§ 10(b)]." 15 U.S.C. § 78t(a)[5]. To

---

5. Section 20(a) provides that

[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

establish control liability for an individual defendant under § 20(a), a plaintiff must allege (1) a primary violation, (2) scienter, and (3) control of the primary violator by the defendant. *See Robbins,* 788 F.Supp. at 188. Although the district courts in the Second Circuit have been divided regarding the burden of proof for controlling person liability, this Court believes that the plaintiff must allege and prove control, and then the burden shifts to the defendant to plead good faith and lack of participation.[6]

Plaintiffs have adequately alleged a primary violation by Quintel.

 Plaintiffs allege that the individual defendants influenced and controlled the decision-making of Quintel, "including the content and dissemination of various statements which plaintiff contends are false and misleading." Plaintiffs specify that the individual defendants had access to Quintel's internal reports, press releases, public filings, and had the ability to prevent the issuance of or correct the statements. These allegations are adequate to make out a prima facie case for control person liability under § 20(a). In *Robbins,* the plaintiffs established a claim under § 20(a) by reciting in the complaint the position of each individual defendant and identifying the defendants who signed statements alleged to be misleading. *Robbins,* 788 F.Supp. at 187–88; *see also In re Leslie Fay Companies, Inc. Secs. Litig.,* 918 F.Supp. 749, 762 (S.D.N.Y.1996) (J. Conner) (finding complaint that alleged that the individual defendants served as directors, signed SEC filings and were in a position to control and influence the company's business and operations was sufficient to withstand a motion to dismiss). Plaintiffs' allegations that the individual defendants had control over the dissemination of the false and misleading statements

are even more specific than those in the complaint in *Robbins,* and are similar to those in *Leslie Fay Companies.* The Complaint is sufficient to state a claim against the individual defendants under § 20(a).

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted with respect to plaintiffs' claim based upon violations of Item 303 of SEC Regulation S–K and denied with respect to all other claims by the Plaintiff. Motion to Dismiss is granted in part, and denied in part.

**SO ORDERED.**

---

15 U.S.C. § 78t(a).

**6.** Other district courts have required the plaintiff to allege and prove culpable participation by the individual defendant. *See Healey v. Chelsea Resources Ltd.,* 736 F.Supp. 488, 495 (S.D.N.Y.1990) (discussing the disagreement in the Second Circuit on the burden of

proof for Section 20(a) allegations and concluding that the Second Circuit "now only requires that the plaintiff allege and prove control, leaving it to the defendant to plead and prove good faith and lack of participation").