**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NEW MEXICO STATE INVESTMENT
COUNCIL, Lead Plaintiff,
            *Plaintiff-Appellant,*

and

SONAM BAKSHI, individually and on
behalf of all others similarly
situated; BAKERS LOCAL NO. 433
PENSION FUND; MINNESOTA BAKERS
UNION PENSION FUND; TWIN CITIES
BAKERY DRIVERS PENSION FUND,
            *Plaintiffs,*

v.

ERNST & YOUNG LLP,
            *Defendant-Appellee,*

and

HENRY SAMUELI; WILLIAM J.
RUEHLE; BROADCOM CORPORATION;
DAVID A. DULL; ALAN E. ROSS;
WERNER F. WOLFEN; GEORGE L.
FARINSKY,
            *Defendants.*

No. 09-55632

D.C. No.
2:06-CV-05036-
R-CW

OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
November 1, 2010—Pasadena, California

Filed April 14, 2011

5033

Before: Johnnie B. Rawlinson and Alfred T. Goodwin,
Circuit Judges, and Jack Zouhary, District Judge.*

Opinion by Judge Zouhary

*The Honorable Jack Zouhary, United States District Judge for the
Northern District of Ohio, sitting by designation.

**COUNSEL**

Thomas A. Dubbs (argued), Joseph A. Fonti, and Stephen W. Tountas, Labaton Sucharow LLP, New York, New York, for lead plaintiff-appellant New Mexico State Investment Council.

Robert B. Hubbel (argued), Michael M. Farhang, and Alexander K. Mircheff, Gibson, Dunn & Crutcher LLP, Los Angeles, California, for defendant-appellee Ernst & Young, LLP.

## OPINION

ZOUHARY, District Judge:

### INTRODUCTION

Lead Plaintiff New Mexico State Investment Council, individually and on behalf of all others similarly situated ("Plaintiffs"), appeals the district court's grant of Defendant Ernst & Young's ("EY") Motion to Dismiss. The claims against EY stem from a securities class action complaint against Broadcom Corporation ("Broadcom"), certain Broadcom officers and directors, and Broadcom's auditor EY (collectively, "Defendants"), for a fraudulent $2.2 billion stock options backdating scheme. Plaintiffs specifically allege that EY, as Broadcom's auditor, knew of, or recklessly disregarded, Broadcom's fraudulent backdating actions yet issued unqualified audit opinions attesting to the validity of Broadcom's financial statements. The district court granted EY's Motion to Dismiss, finding the Consolidated Amended Class Action Complaint ("Complaint") failed to adequately plead scienter against EY.

Plaintiffs contend on appeal that the Complaint contains well-pled factual allegations sufficient to survive a motion to dismiss. EY argues dismissal was proper and, in the alternative, the district court's judgment should be affirmed based on Plaintiffs' failure to sufficiently plead loss causation, a ground the district court explicitly did not reach.[1]

---

[1]EY argues this Court can affirm "on any ground supported by the record, even if the district court did not rely on the ground." *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 950 (9th Cir. 2005). While correct, the U.S. Supreme Court cautions: "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *see also Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998). Because the district judge stated explicitly that he did not reach the issue of loss causation with respect to EY, we will not second guess the district court in the absence of a record.

## PROCEDURAL HISTORY and BACKGROUND

### Procedural History

This case finds its roots in a large accounting fraud related to stock option backdating. Broadcom, a semiconductor company with revenues in excess of $2.5 billion in 2006, fraudulently overstated its net earnings, and understated its compensation expense, by more than $2.2 billion between 2000 and 2006 due to improper accounting of backdated stock options.

In October 2008, Plaintiffs filed a Consolidated Amended Class Action Complaint on behalf of all persons who purchased Broadcom Class A common stock between July 21, 2005 and July 13, 2006. The Complaint seeks damages under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities Exchange Commission Rule 10b-5 for Defendants' fraudulent accounting practices, alleging they caused Broadcom's stock price to be artificially inflated.

Defendants moved to dismiss. The district court heard oral argument in February 2009 and granted Defendant EY's Motion to Dismiss, stating: "I think the allegations are deficient on actual knowledge of the defendant . . . , and I think there's a little bit of a heavier burden of allegations on accountants on the question of scienter." "Plaintiff has failed adequately to plead scienter as against EY[.]"

### The Complaint

The lengthy Complaint includes nearly thirty-five pages of allegations that EY, as Broadcom's auditor, was complicit in a stock option backdating scheme involving options to purchase over 239 million shares of Broadcom stock between 1998 and 2005. Broadcom used stock options as part of a compensation package for officers, directors, and key

employees. The recipient of the option was given the opportunity to purchase a certain number of shares of company stock at a given price on or after a predetermined date.[2] Broadcom's option plan provided for a vesting schedule of four years, meaning an employee could only exercise his or her option over a four-year period.

Backdating of options is akin to betting on a horse race after the horse has already crossed the finish line. Backdating of options occurs when a company's officers or directors responsible for administering the stock option plan monitor the price of the company stock and then award a stock option grant as of a certain date in the past when the share price was lowest, thus locking in the largest possible gain for the option recipient.

A backdated option is not in and of itself improper under the law or accounting principles. *See Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 788 (11th Cir. 2010). However, when a company chooses to issue such "in the money" options (so called because the options represent an immediate paper profit), accounting principles require the company to record an expense for the "profit," treated as compensation to the option recipient over the vesting period. If the company does not properly record the backdated options, then the company's reported net income is

---

[2]For example, if the company granted an option to an employee to purchase 100 shares at a "strike price" of $10/share, the employee can purchase 100 shares for $1,000, regardless of the market price for the shares on the date the employee exercises the option. Thus, if the market price for the shares on the day the option was exercised was $15/share, the employee had an immediate paper profit of $5/share. If, however, the market price for the stock is lower than the strike price on the day the option can be exercised, the option is worthless because the stock could be purchased on the open market cheaper than by exercising the option. Options typically vest over a set time period. E.g., if the grant was 100 shares at $10/share over four years, the employee could exercise the option to purchase 25 shares per year (4 years x 25 shares = 100 total shares).

overstated for each of the years the options vest, potentially deceiving the market and investors.

### The Restatement and EY Opinion

Broadcom engaged in an improper stock option backdating scheme that required the company to restate its financial statements in January 2007 for fiscal years 1998 to 2005 (the "Restatement"). The Restatement acknowledged that Broadcom had improperly accounted for $2.2 billion in income, largely due to improper option backdating. Additionally, every financial statement, and quarterly and annual report issued during the time period covered by the Restatement, was false and misleading. As a result, Broadcom agreed to a civil penalty of $12 million in connection with a SEC civil securities fraud investigation, and various Broadcom officers and directors face civil and criminal charges.

The crux of Plaintiffs' claim is that EY, in its role of auditor issuing the unqualified 2005 Opinion, knew of, or was deliberately reckless in not knowing, that the 2005 Opinion was materially false and misleading due to Broadcom's stock option backdating scheme. The 2005 Opinion covered three years of Broadcom's financial statements (2003-05), stating that the financial statements "present fairly, in all material respects, the consolidated financial position of Broadcom Corporation at December 31, 2005 and 2004, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2005, in conformity with generally accepted accounting principles [("GAAP")]." The 2005 Opinion also stated that EY had performed the audit in accordance with generally accepted auditing standards ("GAAS").

### Allegations Against EY

Plaintiffs' allegations that EY had the required scienter for a fraud claim, namely that EY knew, or was deliberately reck-

less in not knowing, about the fraudulent option backdating, are as follows:

- EY knew the material consequences of a May 2000 backdated option grant that would have resulted in a $700 million charge to Broadcom's financial results but, despite violations of GAAS, signed off on the grant without obtaining documentation;

- EY knew that several significant option grants were approved on dates when Broadcom's compensation committee was not legally constituted due to the death of one of the two committee members;

- EY presided over corrective reforms in 2003 to prevent and detect any future instances of improper stock option awards without questioning the integrity of Broadcom's accounting for options granted prior to the corrective reforms;

- EY knew that there was insufficient documentation for nearly half of the $2.2 billion in backdated option grants in violation of GAAS;

- EY knew that Broadcom's internal controls were weak and failed to expand the scope of its audit procedures as required under GAAS; and

- EY was deliberately reckless in ignoring a number of "red flags" that should have alerted them to the potential for material misstatements related to stock-based compensation.

The Complaint includes additional details with respect to each of the above allegations, and Plaintiffs argue that these detailed allegations, both individually and collectively, sup-

port a strong inference that EY had the necessary scienter to survive a Motion to Dismiss.

## STANDARD OF REVIEW

We review *de novo* challenges to a dismissal for failure to state a claim under Federal Civil Rule 12(b)(6). *Livid Holdings, Ltd.*, 416 F.3d at 946. Such review is generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of judicial notice. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). In undertaking this review, we will "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs," *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002), and will hold a dismissal inappropriate unless the complaint fails to "state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ALLEGATIONS OF SCIENTER

**[1]** To adequately plead scienter, a securities fraud complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A complaint can plead scienter by raising a strong inference that the defendant possessed actual knowledge or acted with deliberate recklessness. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Contrary to the district court's comment that scienter allegations against accountants or auditors carry "a little bit of a heavier burden," this Court has previously advised against developing "separate[ ] rules of thumb for each type of scienter allegation." *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

A securities fraud complaint will survive a motion to dismiss under Rule 12(b)(6) "only if a reasonable person would

deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.*, 551 U.S. at 324. Thus, a court reviewing scienter allegations under the Private Securities Litigation Reform Act of 1995 ("PSLRA") must "consider the complaint in its entirety." *Id.* at 322. The court must determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. Finally, when "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* This "inquiry is inherently comparative." *Id.* A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference. *See id.* at 324; *see also Metzler Inv.*, 540 F.3d at 1066.

**[2]** Under *Tellabs* and Ninth Circuit law, we conduct a two-part inquiry for scienter: first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness. *Zucco*, 552 F.3d at 991-92. Arguing that EY was, or should have been, aware of significant accounting problems within audit years covered by its 2005 Opinion, Plaintiffs allege scienter based on three specific points when EY was faced with circumstances that would compel a reasonable auditor to further investigate and disclose Broadcom's backdating of options: (1) a large grant of options on May 26, 2000 for which EY was given no documentation; (2) options granted in 2001 during a period when Broadcom's compensation committee did not have a quorum due to the death of one of its members; and (3) EY's direct

involvement in 2003 with corrective reforms to Broadcom's prior options practices.

We hold that these factual allegations were each sufficient to support an inference of scienter by EY. While a holistic review is therefore unnecessary, these primary allegations certainly support an inference of scienter when viewed collectively with other claims that EY received no documentation for many option grants, knew Broadcom's internal controls were weak, and ignored other red flags.

**EY's Knowledge of the May 2000 Backdated Option Grant**

Plaintiffs' most detailed allegations of scienter involve a series of events surrounding a large stock option grant on May 26, 2000, when Broadcom's Compensation and Options Committee allegedly granted over seven million options to various senior officers. At the time, this was the single largest grant of stock options in Broadcom's history. The choice of the May date for the option grant was suspect because, on that day, not only was the price of Broadcom's stock at its lowest point for the entire month of May, but also the lowest closing price since October 1999 and, as it turns out, until October 2000.

By July 2000, EY started to question the timing of the May 2000 grant, as Broadcom's stock price had risen from $118 per share on May 26, 2000 to a high of $261 per share in July 2000. Plaintiffs allege that EY knew by July 2000 that Broadcom had not yet allocated the grants to its employees, as required under GAAS, but failed to investigate. Accordingly, EY's issuance of the unqualified 2005 Opinion (including the accuracy of Broadcom's 2003-05 financials) represented a material misstatement.

The Complaint points to emails sent on July 20, 2000. Broadcom's Manager of Financial Reporting informed Broad-

com's CFO that she was "experiencing resistance from [EY]" and that "[t]he basic concern is the measurement date of these grants (5/26/00)." The Manager of Financial Reporting also informed the CFO that "[the auditors] could require us to record compensation expenses . . . [that] could be over $700 million based on the 5/26/00 price and the current price!" Later that day, Broadcom's CFO informed the CEO that EY was requesting documentation, which did not exist, for the May 2000 grant, and that EY was "making noise" that the company will have to take a $700 million compensation charge.

Concern over the measurement date of the grant was based on a specific GAAP standard. The reporting of expenses associated with stock options is governed by an opinion by the Accounting Principles Board entitled "Accounting for Stock Issued to Employees." ACCOUNTING PRINCIPLES BOARD, OPINION NO. 25 (1972) ("APB 25").[3] Under APB 25, if the options had an exercise price lower than the fair market value of the stock as of the "measurement date," the company would have to recognize a compensation expense over the option's vesting period or the period of time the employee performed services for the company. The expense would be equal to the difference between fair market value as of the grant date and the exercise price. APB 25 §§ 12-14.

Critical to this rule is the option's "measurement date." This term refers to the date on which the fair market value of the option is determined. The measurement date is the first date on which *both* of the following are known: (1) the number of options that each *individual employee* is entitled to

---

[3]The Financial Accounting Standards Board promulgated Rule FAS123 in 1995 with the intent of replacing APB 25 for the accounting of stock options. However, companies were permitted to continue using APB 25 in reporting their financial statements. Broadcom chose to continue using APB 25 as reflected in its financial statements during the relevant time period.

receive, and (2) the option or purchase price. APB 25.10(b). Frequently, the measurement date is the date the option is granted to the employee. *Id.* There are instances where the measurement date can be more complicated to measure, such as an option grant conditioned on some other event occurring, such as a promotion or assuming a new position. *See In re CNET Networks, Inc.*, 483 F. Supp. 2d 947, 955 (N.D. Cal. 2007). When a company, under proper guidance of the board of directors and executives, chooses to award a block of options to various employees, the measurement date cannot be established until the exact recipients and their respective number of options are identified. *Id.* at 955-56 (citing APB 25.10(b)).

Plaintiffs allege that EY violated GAAS by failing to verify whether Broadcom's May 2000 option grant was in violation of GAAP and APB 25. GAAS standards provide, in part:

> [T]he accountant may become aware of matters that cause him or her to believe that interim financial information, filed or to be filed with a specified regulatory agency, is probably materially misstated as a result of a departure from generally accepted accounting principles. In such circumstances, the accountant should discuss the matters with the appropriate level of management as soon as practicable. . . . If, in the accountant's judgment, management does not respond appropriately to the accountant's communication within a reasonable period of time, the accountant should inform the audit committee, or others with equivalent authority and responsibility . . . of the matters as soon as practicable.

PUBLIC COMPANY ACCOUNTING OVERSIGHT BOARD ("PCAOB"), INTERIM AUDITING STANDARDS ("AU") § 722A.20-.21. GAAS also requires an auditor to maintain independence in mental attitude during an audit, to obtain sufficient evidence to afford

a reasonable basis for its opinion, and for financial statements subject to audit to be presented in accordance with GAAP. *See* AU §§ 220, 410; PCAOB, AUDITING STANDARDS ("AS") § 15.04.

The EY audit team, led by partners Blythe and Stump, allegedly engaged in an "intense discussion" but no follow up with Broadcom's executives, and eventually "capitulated" to Broadcom's CFO on July 24, 2000, ultimately relying on a single conversation with him that the option grant was properly accounted. Plaintiffs claim that the CFO told EY that, on May 26, 2000, the Options Committee had (1) authorized a fixed number of options to be granted; and (2) approved a "program" establishing a set "Guideline Matrix" for calculating the number of options awarded to each employee. Plaintiffs allege that the CFO's oral representation was not sufficient to satisfy GAAP, and that EY neither received nor relied on *any* documents from Broadcom *before* EY signed-off on the May 2000 grant, thereby violating GAAS.

In further support of EY's wrongdoing, Plaintiffs point to another email, sent on September 11, 2000 by Broadcom's Manager of Financial Reporting to its CFO, acknowledging that EY granted Broadcom "flexibility" with respect to the May 2000 grant, and that "[g]oing forward, we can expect much greater scrutiny by [the auditors] on our option granting process."

As a result of these events, Plaintiffs argue: (1) EY had actual knowledge that the May 2000 option grant did not comply with GAAP and that EY's own audit did not comply with GAAS; and (2) because the Broadcom options had a four-year vesting period, the consequences of the May 2000 grant caused material misstatements in Broadcom's audited financial statements in fiscal years 2001-04, years expressly covered in the 2005 Opinion.

Typically, pleading sufficient facts to support a strong inference of scienter by an outside auditor is difficult because

outsider auditors have more limited information than, for example, the company executives who oversee the audit. Further, an auditor exercises "complex and subjective professional judgments that courts are not ideally positioned to second guess." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1197 (C.D. Cal. 2008). In examining allegations of scienter, courts have looked at a range of factors for potential "red flags," including the interaction of auditors with company executives and the breadth and scope of the auditor's deviation from GAAP or GAAS. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 673-85 (S.D. Tex. 2002).

The "red flag" doctrine guides the GAAP and GAAS inquiries: the more facts alleged that should cause a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes. *In re Countrywide*, 588 F. Supp. 2d at 1197; *see also DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002). "Scienter requires more than a misapplication of accounting principles. The plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Software Toolworks Inc.*, 50 F.3d 615, 628 (9th Cir. 1994) (quoting *Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.)*, 35 F.3d 1407, 1426 (9th Cir. 1994)).

When assessing GAAP violations in connection with auditor scienter, the violations should generally be more than "minor or technical in nature" and "constitute [ ] widespread and significant inflation" to contribute to a strong inference of scienter. *In re Daou Systems, Inc.*, 411 F.3d 1006, 1017 (9th Cir. 2005). While a violation of GAAP, standing alone, is not sufficient, allegations of recklessness have been sufficient where defendants "failed to review or check information that

they had a duty to monitor, or ignored obvious signs of fraud." *Novak v. Kasaks*, 216 F.3d 300, 308-09 (2nd Cir. 2000).

With respect to allegations of GAAS violations and how an audit is conducted, "[a]lleging a poor audit is not equivalent to alleging an intent to deceive." *Ezra Charitable Trust v. Tyco Int'l Ltd.*, 466 F.3d 1, 12 n.10 (1st Cir. 2006). Rather, just as with GAAP, the more likely an auditor would have discovered the truth if a reasonable audit had been conducted, the stronger the scienter inference. *In re Countrywide*, 588 F. Supp. 2d at 1198.

**[3]** Against this backdrop, we consider the factual allegations that EY failed to further investigate the May 2000 option grant. EY had knowledge that the grant was, at a minimum, suspicious in not only its timing but its relative size. It was the largest option grant in the company's young history and the potential $700 million impact on Broadcom's earnings was material. Despite this knowledge as reflected in the specific email exchanges recited in the Complaint, EY apparently did not take steps to verify the accuracy of the grant, then or later. This failure to investigate such a large grant was not minor or technical in nature, and it is hard to imagine how a reasonable auditor, confronted with the same set of circumstances, would fail to obtain some documentation to verify Broadcom's executive claim of a "Guideline Matrix program" being put in place on that very day. EY apparently accepted management at its word, never received requested documentation, and issued an unqualified Opinion on the accuracy of Broadcom's financial statements. These circumstances are sufficient to support an inference that EY knew, or should have known, the May 2000 options were not legitimate. *See In re Homestore.com, Inc. Sec. Litig.*, 252 F. Supp. 2d 1018, 1044 (C.D. Cal. 2003), *vacated on other grounds by Simpson v. Homestore.com, Inc.*, 519 F.3d 1041 (9th Cir. 2008) (finding necessary scienter in denying a motion to dismiss, stating that it was a "logical inference that because [the auditor] objected to

some transactions, it knew that the transactions and the accounting of them were improper" and "[t]he fact that it also allowed some of them to be reported [improperly] shows that [the auditor] acted with deliberate recklessness in failing to properly audit [the] transactions").

EY fails to suggest a more compelling innocent inference from the circumstances alleged in the Complaint. While it may be true that Broadcom lied to EY's audit partners about the creation of the "Guideline Matrix," and Broadcom may have even drafted fraudulent documents in support of the Guideline Matrix, nonetheless EY never received or reviewed *any* documents, real or fraudulent.

EY would lead this Court to believe that its failure to further investigate amounts to, at most, negligence. However, an auditor, in fulfilling duties of public trust, should take a long hard look at a transaction of $700 million, roughly a quarter of Broadcom's reported revenue in 2006 of $2.5 billion. This Complaint alleges more than negligence. EY, as Broadcom's auditor, owes its ultimate allegiance to the company creditors and stockholders, as well as to the investing public. *See United States v. Arthur Young & Co.*, 465 U.S. 805, 817-18 (1984). By offering an "unqualified" or "clean" audit opinion, as EY did in its 2005 Opinion, EY provided the "highest level of assurance." *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 663 n.4 (3rd Cir. 2002). "Accountants will 'qualify' their opinion where discrepancies are identified in a client's financial statements." *Id.*

EY relies on *Public Employees' Retirement Ass'n of Colo. v. Deloitte & Touche*, 551 F.3d 305, 314 (4th Cir. 2009), where the court held generally that failing to review documentation may not be enough to support a strong inference of scienter. However, the facts at issue in that case are distinctly different from this case. In *Public Employees'*, the documents were secret side letters that contradicted joint venture agreements. The auditors were, however, provided letters attesting

(wrongly) otherwise. The court noted, "[w]ith perfect hind-sight, one might posit that defendants should have required *stronger* evidence of control from [the company]." *Id.* But the point remains that the auditors had already asked for and received some documentation—they could not be blamed for failing to see secret side letters purposely kept hidden. Fur-thermore, when the auditor discovered the company had been lying, the company, two days later, announced it had mis-stated its revenues. *Id.* at 309. Here, there were no secret let-ters; EY noticed there could be a significant issue with the option grant; EY asked for documentation, but when none was received, EY still signed off.

Finally, EY wrongly claims that the 2005 Opinion has no connection to the May 2000 option. As noted previously, the 2005 Opinion expressly covered the 2003-05 financial state-ments. Because Broadcom's options vested over a four-year period, the 2000 option grant would have been accounted for in the 2001-04 fiscal years, resulting in two years of overlap between the fraudulent options grant and EY's audited finan-cial statements.

EY argues Plaintiffs cannot show a concrete connection between the auditors who performed the audit in 2000 and those who issued the 2005 Opinion; in other words, that Plaintiffs cannot rely on a "roving scienter" across the rele-vant time period. However, EY cannot insulate itself from accountability for multiple years of approved financial state-ments with a "right hand, left hand" defense. Clearly, with any doubts, EY could limit its Opinion to the years for which it is confident in the audit. EY, despite serving continuously as Broadcom's auditor from 1998 until 2008, during which it attested to the accuracy of Broadcom's financial statements for the multiple years noted in the 2005 Opinion, cannot now disclaim those prior opinions simply because the same indi-viduals were not involved.

### Option Grants Approved When Compensation Committee Was Not Legally Constituted

Plaintiffs' second argument is that the Complaint pleads sufficient facts to support a strong inference of scienter based on EY's failure to audit option grants allegedly awarded on dates when Broadcom's compensation committee lacked authority to act because the committee was not legally constituted due to the death of one of the committee members.

Under Broadcom's bylaws, the board of directors compensation committee possessed sole authority to issue stock option grants to Broadcom officers. The compensation committee was required to have a minimum of two members for a quorum. As of July 2001, the committee was composed of just two members. One of those members died, leaving the committee without its required two-member quorum to issue options. A replacement was not appointed until February 2002 when a resolution, appointing the new committee member, was backdated effective as of October 2001.

During the period between June 2001 through December 2001, Broadcom's compensation committee allegedly approved stock option grants on June 24, October 19, and December 24. During the same time period, Broadcom was also using unanimous written consent ("UWC") resolutions to approve options on dates after the actual date the grant supposedly was approved.

The Complaint alleges that, with respect to the June 24, 2001 grant, EY was presented with unsigned draft minutes that had been fabricated to approve the June option grant; the UWC 'approving' the June grant was signed *after* the death of the compensation committee member, meaning the grant was not validly executed; and Broadcom specifically consulted with EY on the June 24, 2001 option grant to determine whether a compensation charge was necessary. Thus, not only did EY allegedly accept unsigned draft minutes, but also

accepted later documentation that could not possibly have been valid. Similarly, EY allegedly accepted a falsified UWC in March 2002 as support for the October and December 2001 option grants, and a UWC nearly two months *after* EY had already signed the unqualified audit Opinion for 2001.

**[4]** Taking these allegations as true, as required at this stage, Plaintiffs provide an inference of scienter at least as compelling as any opposing innocent inference offered by EY. While the Complaint indicates that Broadcom executives may have attempted to deceive EY, there is an equal inference that EY overlooked significant events without further questioning or investigation. The failure of EY to follow up on the grant approvals, and to sign off on these options months later after reviewing false documentation, sufficiently pleads an audit so deficient that the audit amounted to no audit at all. *See In re Software Toolworks Inc.*, 50 F.3d at 628.

Moreover, these questionable option grants ultimately required a compensation expense of $569 million in Broadcom's Restatement. While EY is correct that magnitude alone is not sufficient to support a finding of scienter, large GAAP and GAAS violations can play a role in finding scienter. *See Carley Capital Group v. Deloitte & Touche*, 27 F. Supp. 2d 1324, 1339-40 (N.D. Ga. 1998) ("[w]hile alleging a misapplication of [GAAP] standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter . . . . [and] the totality and magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior"); *see also In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) (stating the magnitude of the GAAP error can play a role in inferring scienter).

### Involvement in Broadcom's 2003 Corrective Reforms

The Complaint alleges that EY had direct knowledge of the irregularities in Broadcom's option granting process due to

EY's participation in "corrective" reforms undertaken in 2003 to ensure future option grants were treated properly.

In June 2003, the Broadcom board of directors "significantly strengthened [its] options granting practices and put into place rigorous processes to prevent and detect any future instances of improper accounting for equity awards." Press Release, Broadcom Corp., Broadcom Completes Restatement of Financial Statements (Jan. 23, 2007). This announcement was made by the Broadcom CEO in January 2007 in connection with the Restatement of Broadcom's financial statements. The Restatement declared the board "made significant corrective changes to its options granting and documenting processes."

Plaintiffs allege that EY, as Broadcom's auditor, presided over or participated in the 2003 reforms and, by doing so, EY had knowledge that prior option grants caused previously reported financials to be false and could not be relied upon. Despite this knowledge, EY did not investigate the prior grants and did not encourage Broadcom to submit to a restatement of its financial statements. Instead, EY continued to issue unqualified audit opinions, including the 2005 Opinion that validated several earlier years in which the improperly accounted option grants would have materially impacted Broadcom's financial results. Not until the 2007 Restatement did the 2003 corrective reforms become public knowledge.

EY, citing *Zucco*, claims the 2003 corrective reforms cannot be indicative of scienter because Broadcom was simply making changes based on the 2002 congressional mandate of the Sarbanes Oxley Act ("SOX"). Not so.

First, EY participated in, perhaps presided over, the 2003 corrective reforms. Second, these changes were not simply part of Broadcom's SOX compliance because Broadcom's 2003 proxy statement shows the SOX reforms were completed *before* the implementation of the corrective reforms

described in the Complaint. Third, Broadcom's description of the 2003 corrective reforms makes it clear the changes were made specifically to address improper option procedures. Indeed, all option grants after the 2003 reforms were accounted for properly. Fourth, and finally, despite these reforms taking place in 2003, EY apparently took no action to revisit the audits of earlier grants or to inform creditors, stockholders, or the investing public as EY was required to do. *See e.g.*, *United States v. Arthur Young & Co.*, 465 U.S. at 817-18.

**[5]** Here, the allegations strongly suggest EY knew of and participated in the corrective reforms to address improper stock option grants, but made no communication and took no action until Broadcom announced its Restatement several *years* later. This scenario survives a motion to dismiss.

### Plaintiffs' Remaining Scienter Allegations

Plaintiffs also allege several other grounds that would support finding the necessary scienter with respect to EY. The Complaint claims EY knew there was insufficient documentation for nearly half of the $2.2 billion in backdated option grants in violation of GAAS; EY knew Broadcom's internal controls were weak and failed to expand the scope of its audit procedures as required under GAAS; and EY recklessly ignored a number of "red flags" that should have alerted it to the potential for material misstatements related to stock-based compensation. Each of these grounds include additional facts but also somewhat overlaps with the three major claims presented above. These remaining allegations support an inference that EY's actions fell far short of the standard expected of a public company auditor.

For example, the Complaint recites that nearly half of the $2.2 billion Restatement resulted from option awards for which there was no contemporaneous documentation. While not explicitly required under GAAP and GAAS, the auditing

standards do give strong guidance to auditors to dig deeper once there are questionable circumstances surrounding such material transactions. *See e.g.*, PCAOB AU §§ 319.69, 333.02. While EY argues there was nothing technically incorrect at the time each of the questionable grants was audited individually, EY fails to explain how it could innocently overlook the number and magnitude of the aggregate amount of undocumented grants, particularly in light of GAAS and its knowledge of the 2003 corrective reforms. Considering the number, magnitude, and multi-year financial impacts of these grants, it is certainly reasonable to infer scienter just as strongly as an innocent inference.

Finally, the Complaint lists a number of "red flags" that arguably should have alerted EY to Broadcom's wrongdoing and that EY allegedly would have had to purposely or recklessly overlook. These include elements of the 2000 option grants and the deceased member of the compensation committee, option grant dates that were sporadic, suspiciously long delays between the award of stock options and the UWC approving the grant, and option grant dates set at or near the low stock price for the quarter in which the options were granted followed by a typical price surge soon after the dates of the option awards.

As other courts have noted, "[a]t the pleading stage, courts have recognized that allegations of GAAS violations, coupled with allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279-80 (3d Cir. 2006) (citing cases). However, "[s]uch allegations . . . must be pled with particularity. It is insufficient, for example, for a plaintiff to cite GAAS standards without an explanation of how the defendant knowingly or recklessly violated those standards." *Id.* at 280 (citations omitted).

**[6]** Here, Plaintiffs have not simply cited GAAS standards in connection with vague claims that EY failed to comply

with the standards. The Complaint is loaded with specific allegations of how and why EY should have investigated deficient or missing documentation. Even after being alerted to potential problems during the 2003 corrective reforms, EY's behavior, and perhaps more importantly, its unqualified audit opinions, did not change. These red flags further support a strong inference of scienter.

**Holistic Review of Plaintiffs' Allegations**

In addition to reviewing the allegations of scienter individually, this Court has also viewed the claims "holistically." When viewed in totality, there is no doubt the allegations, at this early phase of the proceedings, present at least as strong an inference of scienter as any competing innocent inference.

As stated by the court in *In re Oxford Health Plans Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999), the "[P]laintiffs allege 'in your face facts,' that cry out, 'how could [defendants] not have known that the financial statements were false.'" (citation omitted). EY, as Broadcom's auditor from 1998 until being fired in 2008, repeatedly offered unqualified audit opinions despite an awareness of large, undocumented stock option grants, and despite having suspicions of Broadcom's option grant procedures multiple times over the years, from the questionable $700 million May 2000 grant, to the three separate 2001 grants when one of the two compensation committee members was deceased, to assisting Broadcom in 2003 with corrective actions to "prevent and detect any future instances of improper accounting for equity awards." During this entire time, EY failed to change course. While Broadcom's bad acts certainly may have played a role in the overall fraud, this Court's purpose at this stage, under *Tellabs*, is simply to test whether the Complaint provides a sufficient inference of scienter for the case to proceed against EY. It does.

## CONCLUSION

For the reasons set forth above, we **REVERSE** the ruling granting Defendant EY's Motion to Dismiss, and **REMAND** the case for further proceedings consistent with this Opinion.