**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 19, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANTONIO PEDRERA SANCHEZ;
FERNANDO PEDRERA SANCHEZ;
HARVEY BABBITT; DANIEL J.
LUNDBERG,

      Plaintiffs-Appellants,

v.

CROCS, INC; RON SNYDER; PETER
CASE; DELOITTE & TOUCHE;
RUSS HAMMER; SCOTT
CRUTCHFIELD,

      Defendants-Appellees,

and

MICHAEL C. MARGOLIS; JOHN P.
MCCARVEL; RAYMOND D.
CROGHAN; MICHAEL E. MARKS;
RICHARD L. SHARP; THOMAS J.
SMACH,

      Consol Defendant-Appellees.

No. 11-1116
(D.C. No. 1:07-CV-02351-PAB-KLM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **LUCERO**, **HARTZ**, and **HOLMES**, Circuit Judges.

---

    [*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

Plaintiffs-Appellants Antonio Pedrera Sanchez, Fernando Pedrera Sanchez,[1] Harvey Babbitt, and Daniel J. Lundberg (collectively, "Plaintiffs") filed a putative securities fraud class action complaint against Crocs Inc., several company officers (collectively, "Crocs Defendants"), and the company's auditor, Deloitte & Touche, LLP ("Deloitte"), alleging that various company reports fraudulently represented the value of Crocs's inventory and the adequacy of its internal controls over financial reporting. The district court dismissed the complaint for failure to state a claim, and Plaintiffs appealed. The National Roofing Industry Pension Plan ("National Roofing"), which pursued a separate appeal after the district court denied its motion for appointment as lead plaintiff, *see Sanchez v. Crocs, Inc.*, No. 11-1142 (10th Cir., filed Apr. 5, 2011), filed a motion to dismiss Plaintiffs' appeal. While the case was pending before our court, Plaintiffs reached a settlement with the Crocs Defendants; thus Deloitte is the only remaining defendant in this case. National Roofing also agreed to voluntarily dismiss its own appeal in Case No. 11-1142 with prejudice.

Exercising jurisdiction under 28 U.S.C. § 1291, we now **deny as moot** National Roofing's motion to dismiss and **affirm** the district court's dismissal of Plaintiffs' complaint.

---

[1] At times, when referring only to Antonio and Fernando Sanchez, we follow the convention of the parties and the district court and identify them as the "Sanchez Group."

# I

## A[2]

Crocs, Inc. is a Colorado-based shoe manufacturer. When it went into business in 2002, it sold only one product, in six different colors: "colorful shoes with holes in them made of a closed cell resin." Aplt.'s App. at 45 (Compl., filed Dec. 31, 2008). The shoe proved successful, and the company rapidly grew: by 2006, it had expanded its product line to include a variety of footwear, apparel, accessories, and sports equipment. Its products were sold in over 11,000 domestic retail store locations and over 8,000 international retail stores. It also ran manufacturing facilities, or contracted with third-party manufacturers, all over the world. "The majority of its footwear" was manufactured by a Chinese company. *Id.* at 46.

Yet despite its expansion, according to the complaint, Crocs continued to use "archaic, error-prone Excel spreadsheets to track inventory and forecast sales," instead of adopting "the modern standard of using appropriate inventory control software which provides a real-time, up-to-the-minute picture" of a company's inventory. *Id.* at 33. Additionally, the same barcode was assigned to

---

[2] At the motion to dismiss stage, "we accept the well-pleaded allegations of the complaint" as true and we recite the facts in the light most favorable to the plaintiffs. *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015); *accord In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015).

multiple products, and there were no written company procedures or any formal operations manual.

This primitive system created a host of problems with the company's inventory. Because its inventory data was frequently wrong, the company continually "bulk" ordered various styles, colors, and sizes of shoes, many of which did not sell. *Id.* at 49. In fact, some of the style/color/size combinations that the company had manufactured "guaranteed the shoes would never sell, *e.g.*, pallets of size 13 shoes in fuchsia or a color called 'Butter' that was aimed at women." *Id.* at 55. Further, ten thousand pairs of unsold size 13 shoes in "a light green color called Sage" were found in a warehouse in Aurora, Colorado. *Id.* at 59. At the same time, the company frequently ran short of its best-selling shoes, and could not keep up with the demand for those models. Moreover, "pulling together an order to send to a retailer was extremely difficult because no one had reliable data on inventory, and the inventory would often be far away from the retailer who sought it." *Id.* at 54. As a result, Crocs often sent retailers the wrong orders. Crocs also ordered its Chinese manufacturing facility to keep producing up to 1.5 million shoes a week in order to combat counterfeit Crocs shoes that were being sold on the black market. In many instances, the Chinese factories produced inferior products, resulting in a rise in shoe returns.

Because of these alleged missteps, Crocs's inventory "increased four-fold from August to December 2006, and increased the same amount again in 2007

4

through the end of the third quarter, and then again in the fourth quarter of 2007 and the first quarter of 2008." *Id.* at 50. The company's management was apparently aware that its inventory was ballooning; this issue appears to have been discussed in internal communications. But although management recognized that demand for the shoes was decreasing, it anticipated that demand would rebound, and therefore the company sustained its high production level despite the inventory build-up. The company's antiquated data management system was also brought to management's attention; for example, in September 2007, soon after he joined the company, the newly-hired head of information technology sent the company's Chief Operating Officer a highly critical report detailing flaws in the data management system.[3]

Despite these problems, Crocs valued its inventory at cost on both the 2006 and 2007 Form 10-K's it filed with the Securities and Exchange Commission ("SEC").[4] Deloitte, the company's auditor, issued unqualified audit opinions in both years. On the 2006 10-K, for instance, it stated:

---

[3] While the company did eventually purchase better software, it was not used for inventory control until 2008. Further, although the company conducted a manual count of inventory at the end of 2007, the complaint alleges that management ordered trucks filled with unsold shoes to remain in transit during the inventory and shipped approximately 400,000 shoes to a European facility in order to avoid including them in the inventory.

[4] A Form 10-K is a comprehensive financial report filed annually with the SEC. *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.310.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. . . .

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of CROCS, Inc. and subsidiaries as of December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006 in conformity with accounting principles generally accepted in the United States of America.

*Id.* at 165–66. In its 2007 audit opinion, Deloitte not only expressed its unqualified opinion regarding Crocs's financials, but also with respect to the company's internal controls, stating:

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of CROCS, Inc. and subsidiaries as of December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007, in conformity with accounting principles generally accepted in the United States of America. . . .

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2007, based on the criteria established in Internal Control-Integrated Framework issued by the Committee of

6

> Sponsoring Organizations of the Treadway Commission and our report dated February 29, 2008 expressed an unqualified opinion on the Company's internal control over financial reporting.

*Id.* at 167.

Starting in late 2007, however, the company began to publicly disclose issues with its inventory and distribution. For example, on October 31, 2007, Crocs partially revealed its build-up of inventory, causing its stock price to drop thirty-six percent in a single day. On April 14, 2008, Crocs announced that its inventory had increased between five and ten percent in three months, triggering a forty-five percent fall in the stock's price. Finally, in November 2008, the company wrote down the value of its inventory by over seventy million dollars.

**B**

In November 2007, a year prior to the write-down, several plaintiffs filed securities fraud class action lawsuits against the company. These complaints were consolidated, and the Sanchez Group, National Roofing, and others moved to be appointed lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(i) (providing for the appointment of a lead plaintiff "capable of adequately representing the interests of class members"). The district court appointed the Sanchez Group as lead plaintiff, finding that it had the largest financial interest based on its loss of $34.5 million on contracts for difference ("CFDs") that it had purchased through a bank in Denmark. *See id.* § 78u–4(a)(3)(B)(iii)(I) (creating a rebuttable

7

presumption that the "most adequate plaintiff" is the one, *inter alia*, with "the largest financial interest in the relief sought by the class").[5]

The Sanchez Group then filed the complaint at issue in this case. In doing so, it added as named plaintiffs Harvey Babbitt and Daniel J. Lundberg, both of whom lost money on Crocs common stock that they owned.[6] The complaint alleged, *inter alia*, that Crocs, its management, and Deloitte had violated § 10(b) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. According to Plaintiffs, Crocs knew well before 2008 that the "bulk" of its inventory "consisted of unsalable or unsuitable shoes" that could not be sold at cost. Aplt.'s App. at 76. But, instead of disclosing this problem, it valued its inventory at cost on the 2006 and 2007 Form 10-Ks. By doing so, according to the complaint, Crocs materially overstated the value of its inventory, in contravention of generally accepted accounting principles ("GAAP"), under which companies should write down inventory when "there is

---

[5] These CFDs, entered into between the Sanchez Group and the Danish bank, were matched to Crocs common stock purchased by a broker in the United States. The CFDs were "priced based on the purchase and sale price for matching underlying shares of Crocs"; thus, "the price of [the Sanchez Groups'] Crocs CFDs was identical to the contemporaneously quoted price of Crocs common stock." Nat'l Roofing App. at 125 (Decl. of Saxo Bank A/S, filed Jan. 28, 2008). *See generally* Tim Bennett, *CFDs Explained*, MONEY WEEK (Jan. 29, 2013) ("CFDs are similar to spread betting in that you can bet on stock price movements without having to actually own the shares.").

[6] The complaint defined the putative class as all persons or entities that purchased Crocs shares between April 2, 2007 and April 14, 2008.

8

evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes." *Id.* at 156 (quoting Accounting Research Bulletin ("ARB") No. 43).

Plaintiffs further averred that, as the company's auditor, Deloitte was complicit in the fraud. "By virtue of its relationship with CROCS and the nature of the auditing and tax services" it rendered, "and the fact that Deloitte's personnel were regularly present" at Crocs, the auditor had "access to confidential internal corporate, financial, operating and business information." *Id.* at 164. Based on this access, the complaint claims, Deloitte knew about various warning signs, or recklessly disregarded them by failing to exercise professional skepticism or obtain sufficient competent evidential matter. Specifically, Deloitte allegedly either knew of, or turned a blind eye to, "red flags" regarding the following: Crocs's flawed data management system and inventory reporting, including Crocs's use of "error-prone Microsoft Excel spreadsheets" to monitor its inventory, *id.* at 171, the lack of "formal written operating procedures or accounting processes," *id.*, the rapid increase in Crocs's inventory, and the existence of several "risk factors," such as the company's rapid growth and expansion across international boundaries, *id.* at 175.

The complaint alleges that these flaws were obvious. For example, the problems with Crocs's data management system were "so apparent[] that the head

9

of CROCS IT identified significant problems within months of being hired." *Id.* at 173. Yet, despite these warning signs, "which should have raised questions in the auditors' minds" about the value of Crocs's inventory and its internal controls, *id.* at 197, Deloitte issued unqualified audit opinions regarding Crocs's financial statements and, in the case of the 2007 audit, with respect to its internal controls over financial reporting as well. By knowingly or recklessly disregarding these red flags and failing to adequately investigate Crocs's internal controls, the complaint claims that Deloitte did not, in fact, conduct its audit in compliance with generally accepted accounting standards ("GAAS").

The defendants moved to dismiss the complaint for failure to state a claim, and the district court granted their motion. With respect to Deloitte—the only remaining defendant on appeal—the district court held that the complaint failed to sufficiently allege scienter. It found that allegations of Deloitte's "access to confidential internal . . . information" and "the existence of 'red flags'" were too general, and "could be charged against any auditor in the context of an audited company's alleged fraudulent financial filings." *Id.* at 817 (Order on Mots. to Dismiss, filed Feb. 28, 2011). It concluded that Plaintiffs had not specifically alleged that Deloitte had "actual knowledge of the alleged false or omitted facts,"

10

and thus, the complaint at most established negligence on the auditor's part. *Id.* at 818.[7]

Plaintiffs then appealed the dismissal of their complaint, in Case No. 11-1116, and National Roofing appealed the district court's lead plaintiff selection in Case No. 11-1142.[8] National Roofing also moved to dismiss the appeal in Case No. 11-1116 for lack of jurisdiction. However, in February 2012, Plaintiffs and the Crocs Defendants agreed to a proposed settlement. We issued a limited remand in both appeals to allow the district court to consider the settlement, and the district court issued its final approval in September 2014. It thus dismissed the action against the Crocs Defendants "in its entirety with prejudice and on the merits." Dist. Ct. Doc. 222, at 15 (Final J. and Order, filed Sept. 19, 2014).

After the district court entered its final judgment, National Roofing stipulated to a voluntary dismissal of its appeal in Case No. 11-1142 with prejudice. In Case No. 11-1116, only the claims against Deloitte are still before

---

[7] National Roofing also moved for a reconsideration of the lead plaintiff selection, arguing that the Sanchez Group lacked standing in light of the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, which held that the Exchange Act only reaches deceptions "in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. 247, 273 (2010). In National Roofing's view, the CFDs purchased by the Sanchez Group did not fall within § 10(b)'s purview under *Morrison*. The district court denied National Roofing's motion as moot.

[8] We denied National Roofing's motion to consolidate the two appeals because the parties specifically wished to file separate briefs. However, we did coordinate the briefing schedule for both cases.

11

us. Additionally, National Roofing's motion to dismiss Case No. 11-1116 for lack of jurisdiction remains before the court.

## II

At the outset, we must determine whether we need to address National Roofing's motion to dismiss Plaintiffs' appeal for lack of jurisdiction. In this motion, National Roofing claims that "the Sanchez Group lacks standing to pursue the appeal." Mot. to Dismiss, No. 11-1116, at 1 (10th Cir., filed May 11, 2011). The alleged standing deficiency National Roofing identifies in its motion rests on the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). There, the Court held that § 10(b) of the Exchange Act "reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 561 U.S. at 273. National Roofing claims that because the Sanchez Group's CFDs are not listed on a domestic exchange and were purchased abroad, the Sanchez Group "lacked standing under *Morrison* to pursue § 10(b) claims in a United States court for its losses on investments in foreign CFDs." Mot. to Dismiss at 13.

National Roofing filed this motion in Case No. 11-1116 after the other parties opposed its suggestion that Case No. 11-1142—which raises the identical *Morrison*-based argument for dismissal—be heard and decided first. The motion

12

to dismiss was thus a vehicle to raise in this case the same issue presented in Case No. 11-1142. National Roofing's primary motivation for filing the motion was its "concern[] that the Sanchez Group w[ould] attempt to settle its claims with defendants." Mot. to Dismiss at 2.

But since National Roofing filed its motion to dismiss, Plaintiffs have in fact settled with most of the defendants, and National Roofing has stipulated to a voluntary dismissal of its own appeal in Case No. 11-1142 with prejudice. "[A] stipulation of dismissal with prejudice . . . normally constitutes a final judgment on the merits . . . ." *Astron Indus. Assocs., Inc. v. Chrysler Motors Corp.*, 405 F.2d 958, 960 (5th Cir. 1968); *accord Norfolk S. Corp. v. Chevron U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004); *United States v. Cunan*, 156 F.3d 110, 114 (1st Cir. 1998). By agreeing to voluntarily dismiss its related appeal—which raised the same argument presented in the motion to dismiss—with prejudice, National Roofing obtained "a complete adjudication on the merits" of its claim, *Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 534 (4th Cir. 1991), and removed itself from the litigation.

As such, National Roofing no longer has any "personal stake" in the present dispute, *Genesis Healthcare Corp. v. Symczyk*, --- U.S. ----, 133 S. Ct. 1523, 1530 (2013), and because it lacks "a legally cognizable interest in the outcome" of this appeal, we must deny its motion to dismiss the appeal as moot, *Already, LLC v. Nike, Inc.*, --- U.S. ----, 133 S. Ct. 721, 726 (2013) (quoting

13

*Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)); *see Genesis Healthcare Corp.*, 133 S. Ct. at 1528 ("In order to invoke federal-court jurisdiction, a plaintiff must demonstrate that he possesses a legally cognizable interest, or 'personal stake,' in the outcome of the action." (quoting *Camreta v. Greene*, 563 U.S. 692, 701 (2011))); *see also Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1245 (10th Cir. 2009) ("If, during the pendency of the case, circumstances change such that the plaintiff's legally cognizable interest in a case is extinguished, the case is moot, and dismissal may be required.").

Although National Roofing's motion to dismiss is moot because National Roofing does not have a conceivable basis at this juncture to be heard in this appeal, we nevertheless must pause and focus on the substance of its motion because it purports to raise a jurisdictional issue—namely, that the Sanchez Group "lacked standing under *Morrison* to pursue § 10(b) claims" because its losses arose from foreign securities. Mot. to Dismiss at 13. We have an "independent obligation to determine whether subject-matter jurisdiction exists," *Devon Energy Prod. Co. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1208 n.10 (10th Cir. 2012) (quoting *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006)), even where a jurisdictional challenge is raised in a filing that is not properly before the court, *see United States v. Rubio*, 231 F.3d 709, 711 n.1 (10th Cir. 2000) ("Although the motion was untimely, we cannot ignore the jurisdictional issue because we have an independent obligation

14

to examine our subject matter jurisdiction."), *overruled on other grounds by United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004) (en banc) (per curiam).

Thus, while we do not resolve the motion itself, we do take notice of the issue it raises—*viz.*, whether the Supreme Court's decision in *Morrison* deprives the Sanchez Group of standing to sue—and must assess whether *Morrison* in fact impacts our jurisdiction over this case. In short, it does not. Although National Roofing casts its *Morrison*-based argument as jurisdictional, the *Morrison* Court explicitly held that the extraterritorial reach of § 10(b) is a merits issue. *See Morrison*, 561 U.S. at 254 (observing that "to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a *merits question*," and concluding that the district court "had jurisdiction . . . to adjudicate the question whether § 10(b) applie[d] to [the defendant's extraterritorial] conduct" (emphasis added)). We have similarly recognized that, in light of *Morrison*, "the extent to which a statute applies extraterritorially proceeds exclusively as a merits issue, not a question of jurisdiction." *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1096 (10th Cir. 2014); *accord Absolute Activist Value Master Fund Ltd. v. Ficeto,* 677 F.3d 60, 67 (2d Cir. 2012).

Assured that *Morrison*'s holding does not implicate our jurisdiction, we do not pursue this merits-based argument any further because it is raised by a party with no "legally cognizable interest" in its resolution. *Already, LLC*, 133 S. Ct. at

15

726. We are satisfied that subject-matter jurisdiction exists,[9] and now proceed to the merits of Plaintiffs' appeal.

### III

Plaintiffs challenge the district court's dismissal of their securities fraud claim against Deloitte. They argue that the complaint adequately sets out the false and misleading statements made by Deloitte in the 2006 and 2007 Form 10-Ks,[10] and that their allegations give rise to a strong inference of scienter against

---

[9] Plaintiffs have sufficiently alleged the elements of standing. To demonstrate standing, a plaintiff must establish "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Colo. Outfitters Ass'n v. Hickenlooper*, --- F.3d ----, 2016 WL 1105363, at *2 (10th Cir. Mar. 22, 2016) (alteration in original) (quoting *Susan B. Anthony List v. Driehaus*, --- U.S. ----, 134 S. Ct. 2334, 2341 (2014)). Here, the Sanchez Group has alleged a $34.5 million loss on its CFDs—which are tied to underlying Crocs common stock—as a result of the alleged misstatements of Crocs, its management, and Deloitte. Messrs. Babbitt and Lundberg, the other named plaintiffs, similarly allege that they suffered losses on Crocs stock they purchased on the NASDAQ stock exchange as a result of this purportedly fraudulent conduct. "[A]t the pleadings stage, 'the burden imposed' on plaintiffs to establish standing 'is not onerous,'" *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011)), and Plaintiffs satisfy the minimum requirements, *see State of Utah v. Babbitt*, 137 F.3d 1193, 1204 (10th Cir. 1998) ("[A]t the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))).

[10] Deloitte claims that Plaintiffs have waived any claim based on the 2007 financial statements because the cause of action section of their complaint does not mention the 2007 10-K, and because Plaintiffs failed to respond to this argument when Deloitte raised it before the district court. We are not persuaded. First, while the cause of action section of the complaint does not specifically

(continued...)

16

Deloitte. We disagree. Below, after elaborating on the elements of a § 10(b) securities-fraud claim and a plaintiff's burden at the pleadings stage, we conclude that the complaint founders on the heightened pleading standard for scienter imposed by securities law.

## A

Under § 10(b) of the Exchange Act, it is illegal to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, prohibits the making of "any untrue statement of a material fact" or the omission of "a material fact necessary in order to make the statements made . . . not misleading . . . in

---

[10](...continued)
mention the 2007 10-K, it does incorporate paragraphs contained elsewhere in the complaint that do explicitly allege that the 2007 10-K was false and misleading. Second, in responding to the motions to dismiss filed by the Crocs Defendants and Deloitte, Plaintiffs discussed both the 2006 and 2007 10-Ks, stating, for example, that Deloitte "provided unqualified Independent Auditors' Reports which were included in Crocs' 2006 and 2007 10Ks [and,] [i]n rendering its false audit opinions, Deloitte ignored the inflated value of the growing unsalable inventory." Dist. Ct. Doc. 121, at 8 (Pls.' Resp. to Defs.' Mots. to Dismiss, filed June 4, 2009) (citations omitted). The district court also interpreted the complaint's allegations against Deloitte to encompass both the 2006 and 2007 audit opinions.

Thus, it is evident that Plaintiffs neither intentionally relinquished, nor failed "to make the timely assertion of," their argument regarding Crocs's 2007 10-K. *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). That is, they have neither waived nor forfeited any claim with respect to the 2007 audit opinion.

17

connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. A plaintiff alleging a violation of § 10(b) and Rule 10b-5 must demonstrate that a defendant's communications (1) "contained false or misleading statements of material fact"; (2) "related to the purchase or sale of a security"; (3) "were made with intent to defraud investors or conscious disregard of a risk that shareholders would be misled"; (4) "led to reliance by the plaintiff"; and (5) "caused the plaintiff's loss." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146–47 (10th Cir. 2015); *accord In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015).

The scienter element of a § 10(b) claim may be satisfied by allegations of either intent or recklessness. "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior." *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)); *accord Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012). Recklessness involves "conduct that is an *extreme* departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor *must have been aware of it*." *Fleming*, 264 F.3d at 1260 (emphases added) (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)); *accord Anderson v. Spirit AeroSystems Holdings, Inc.*, No. 15-3142, --- F.3d ----, 2016 WL 3618657, at \*2 (10th Cir. July 6, 2016) (quoting *In re Level 3 Commc'ns, Inc.*

18

*Sec. Litig.*, 667 F.3d 1331, 1343 n.12 (10th Cir. 2012)); *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 594 F.3d 783, 790 (11th Cir. 2010).

Generally, recklessness requires that a defendant have "knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Fleming*, 264 F.3d at 1261; *see also Weinstein v. McClendon*, 757 F.3d 1110, 1113 (10th Cir. 2014) (noting that the key determinant of scienter is "whether Defendants knew that not disclosing the [underlying facts] posed substantial likelihood of misleading a reasonable investor" (quoting *Fleming*, 264 F.3d at 1264) (alteration in original)).  Thus, recklessness involves conscious misconduct; negligence, and even gross negligence, fall "below the high threshold for liability under Section 10(b) of the Exchange Act."  *Dronsejko v. Thornton*, 632 F.3d 658, 668 (10th Cir. 2011); *see South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (defining recklessness as "a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*" (quoting *Novak*, 216 F.3d at 312); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 n.7 (6th Cir. 1999) (describing recklessness as "far from negligence and closer to a 'lesser form of intent'" (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977))).

**B**

Our review of the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) is de novo. *See Nakkumphun*, 782 F.3d at 1146. While, at this stage of the litigation, "we must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff," *Gold Res. Corp.*, 776 F.3d at 1108 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997)), a securities-fraud plaintiff's burden at the pleadings stage is nevertheless a heavy one, *see In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d at 1333.

First, Federal Rule of Civil Procedure 9(b) requires that "circumstances constituting fraud" be alleged with particularity. Fed. R. Civ. P. 9(b); *see Nakkhumpun*, 782 F.3d at 1147. Second, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), (2), has created a heightened pleading standard for both the falsity and scienter elements of a § 10(b) action. *See Anderson*, 2016 WL 3618657, at *2 ("[T]he [PSLRA] creates a heightened duty for the plaintiffs to 'state with particularity facts giving rise to *a strong inference* that the defendant[s] acted with the required state of mind.'" (third alteration in original) (emphasis added) (quoting 15 U.S.C. § 78u–4(b)(2)(A))). Under the PSLRA, to be deemed legally sufficient, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission

20

is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). To demonstrate scienter, the plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A); *accord Anderson*, 2016 WL 3618657, at *2.

In assessing the strength of an inference of scienter, a court must look at "the complaint in its entirety," *Dronsejko*, 632 F.3d at 666; *accord Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011); *Anderson*, 2016 WL 3618657, at *2, and "engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged" in order to determine whether the inference of fraudulent intent is "cogent and *at least as compelling* as any opposing inference of nonfraudulent intent," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (emphasis added); *accord Anderson*, 2016 WL 3618657, at *2; *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003) ("We . . . understand a 'strong inference' of scienter to be a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading.").

## C

In their complaint, Plaintiffs allege that Deloitte knew about or recklessly disregarded numerous red flags which "should have raised questions in the auditors' minds and led them to procure additional evidential matter." Aplt.'s App. at 197. These red flags included Crocs's archaic, error-prone system for keeping track of its inventory, the build-up of its inventory, the existence of defective or unsalable shoes in its inventory, and the broader context of its rapid growth and international expansion. Yet, as we explain below, the complaint insufficiently demonstrates that Deloitte knew about these red flags, or that the warning signs were so obviously indicative of fraud that Deloitte's failure to see them as such constituted willful blindness. Thus, Plaintiffs have not established a strong inference that Deloitte acted recklessly, and consequently, their § 10(b) claim fails.

## 1

An inference of recklessness may be justified where the defendant was "*aware of*, but failed to investigate, certain 'red flags' that plainly indicated misconduct was afoot." *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 154 (D. Mass. 2001) (emphasis added); *see, e.g.*, *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098 (9th Cir. 2011) (discerning recklessness where the auditor knew an options grant was suspicious based on specific email exchanges recited in the complaint, yet failed to investigate further); *AUSA Life*

22

*Ins. Co. v. Ernst & Young*, 206 F.3d 202, 221 (2d Cir. 2000) (concluding that the auditor was culpable, even if it did not intend to defraud investors, where it knew of the company's accounting abuses but nonetheless "forged ahead" with issuing unqualified opinions); *see also Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 574 (S.D.N.Y. 2011) ("A defendant has reason to look where it is *aware* of red flags . . . ." (emphasis added)).

In contrast, the "mere fact that an auditor *missed* what a plaintiff labels warning signs gives little support on its own to the conclusion that an auditor was reckless, much less wilfully blind." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 214 (1st Cir. 2005) (emphasis added); *see Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001) (stating that, without allegations that the auditor had "actual awareness . . . of any fraud," missed red flags at best supported an inference of gross negligence). In short, "an unseen red flag cannot be heeded." *Stephenson*, 768 F. Supp. 2d at 573.

Here, the sole alleged basis for Deloitte's knowledge of the red flags is "the fact that Deloitte's personnel were regularly present at" Crocs and had "access to confidential internal corporate, financial, operating and business information." Aplt.'s App. at 164. But generalized averments that an auditor "had continual access to, and knowledge of, [the company's] confidential financial and business information" are "insufficiently concrete" to demonstrate that the auditor was aware of red flags. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir.

23

2004), *abrogated on other grounds by Matrixx Initiatives, Inc.*, 563 U.S. at 48–50; *see DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) (noting that "access to the documents" revealing improper accounting practices does not "strongly compel" an inference of fraudulent scienter "as opposed to ordinary carelessness"); *Ziemba*, 256 F.3d at 1210 ("[P]ossession of documents and other information which . . . should have revealed" red flags "[a]t most . . . raise[s] an inference of gross negligence, but not fraud."); *cf. Anderson*, 2016 WL 3618657, at *9 (refusing to infer scienter by "top executives" who "personally monitored" relevant projects because "[w]e cannot infer scienter based only on a defendant's position in a company or involvement with a particular project").

In order to show that Deloitte was aware of the red flags, Plaintiffs needed to "specifically identify the reports or statements" Deloitte had access to that contained these warning signs. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309); *see Iowa Pub. Emp.'s Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 337 (S.D.N.Y. 2013) ("To survive Defendant's motion, IPERS would have had to . . . show that D & T had access to the pertinent records at the stated time . . . ."), *aff'd*, 558 F. App'x 138 (2d Cir. 2014). Yet the complaint does not identify any particular document reviewed by Deloitte that would have alerted the auditor to the fact that Crocs's day-to-day inventory tracking system was error-

prone, that the company's inventory was growing rapidly, or that the inventory consisted of largely unsalable items. *Cf. N.M. State Inv. Council*, 641 F.3d at 1098 (identifying certain email exchanges that revealed the suspiciousness of the company's stock options grant).

In the absence of such specific allegations, the complaint does not demonstrate that Deloitte was, in fact, aware of the red flags central to Plaintiffs' claim. If Deloitte did not know about the vulnerabilities in Crocs's inventory management system, it could not have known or recklessly ignored the risk that withholding this information would render its unqualified audit opinions false or misleading. *See Fleming*, 264 F.3d at 1260 (stating that recklessness may be found where the "danger of misleading buyers or sellers . . . is . . . known to the defendant"). Thus, these unseen warning signs, while conceivably indicative of negligence on Deloitte's part, fall short of establishing the kind of intentional or conscious misconduct necessary to make out a viable § 10(b) claim.

**2**

Plaintiffs alternatively argue that even if Deloitte did not actually know of the red flags, the auditor's conduct was nonetheless reckless because these warning signs would be "clearly evident to any auditor performing its duties." Aplt.'s Supp. Br. at 12 (citation omitted); *see also* Aplt.'s Reply Br. to Deloitte at 17 ("[T]he fraud at Crocs was so serious and pervasive that Deloitte either knew about it, or recklessly ignored the *clear* signs of it." (emphasis added)).

25

Where warning signs are "so irregular as to put an auditing company on notice for fraud," *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1269 (11th Cir. 2006), we may infer that the "danger of misleading buyers or sellers . . . is so obvious that the [auditor] must have been aware of it," *Fleming*, 264 F.3d at 1260 (quoting *Anixter*, 77 F.3d at 1232); *see Gould*, 692 F.3d at 159 (stating that recklessness may be established where the defendant "ignored obvious signs of fraud" (quoting *Novak*, 216 F.3d at 308)); *see also Air Wis. Airlines Corp. v. Hoeper*, --- U.S. ----, 134 S. Ct. 852, 862 (2014) (stating, in interpreting "reckless disregard" in another statute, that a speaker "cannot avoid liability . . . by sticking its head in the sand to avoid 'actual knowledge' that its statements are false"). Such an inference may be warranted where an auditor's "accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious." *DSAM Global Value Fund*, 288 F.3d at 390 (quoting *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 627–28 (9th Cir. 1994)); *accord In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015); *see also In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006) (stating that the audit must be "so shoddy that [it] amounted at best to a 'pretended audit'").

Here, however, the red flags identified by Plaintiffs are not so patently indicative of fraud that Deloitte's failure to perceive them as such constituted "an egregious refusal to see the obvious." *DSAM Global Value Fund*, 288 F.3d at 390

(quoting *In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d at 627–28).  For

example, even accepting the complaint's allegations that Crocs's system for

monitoring its day-to-day inventory was flawed, a faulty data management system

does not obviously suggest either that Crocs's *annual* inventory was overvalued

or that its controls over financial reporting did not comply with the "Internal

Control-Integrated Framework."  It is especially unclear that Deloitte should have

immediately linked weaknesses in the daily inventory tracking system to flaws in

annual accounting data given the complaint's acknowledgment that a "physical

inventory count was taken once a year, and reconciled to the general ledger."[11]

---

[11]     While the complaint cites to a PricewaterhouseCoopers white paper
and an article in *Computer World* describing the flaws in spreadsheet-based
systems, neither indicates that an Excel-based inventory system violates any
regulations.  Relatedly, the complaint does not allege that these articles expressed
the industry consensus, such that it would have been clear to Deloitte that Crocs's
inventory system was noncompliant with industry standards.  In any event, even if
Crocs's inventory system did violate some regulatory or industry standard, and
Deloitte was aware of this, "without some other facts," *In re Zagg, Inc. Sec.
Litig.*, 797 F.3d 1194, 1204 (10th Cir. 2015), we would not be inclined to
conclude that it would have been perforce obvious to Deloitee that its 10K
representations—insofar as they implicated Crocs's inventory—were fraudulent,
*see Anderson*, 2016 WL 3618657, at *14 ("Even if we assume that Spirit had
violated established accounting principles or internal policies, these violations
would not have been enough to state a valid cause of action").

     Further, although the newly-hired head of Crocs's information technology
department "identified significant problems [with Crocs's data management
system] within months of being hired," Aplt.'s App. at 173, this does not mean
that these issues should have been clear to an *auditor* tasked with assessing
annual inventory valuation and controls over financial reporting.  The cases
Plaintiffs cite to us for the proposition that the rapid discovery of errors by a new

(continued...)

Aplt.'s App. at 161; *see also id.* at 63 (indicating that a physical count was done in connection with Crocs's 2007 audit).[12]

Nor would the buildup of inventory, some of which the complaint alleges was unsalable, have ineluctably led Deloitte to the conclusion that the annual inventory figures were fraudulently inflated. *Cf. Anderson*, 2016 WL 3618657, at *14 (refusing to infer scienter of top executives because they announced a large forward loss on the relevant projects, because "this argument relies on hindsight review based on the size of Spirit's eventual loss and does not include particularized allegations that the four executives knew . . . that Spirit would lose money on the three projects"). The complaint alleges that under Accounting Research Bulletin ("ARB") 43, Crocs should have written down its inventory because many of its shoes were obsolete, defective, or unsuitable for most

---

[11](...continued)
employee is indicative of recklessness largely involve *accounting* violations, and thus do not convince us that flaws that were evident to an IT employee should have been obvious to an accountant. *See, e.g.*, *In re New Century*, 588 F. Supp. 2d 1206, 1231 (C.D. Cal. 2008); *In re First Merchs. Acceptance Corp. Sec. Litig.*, 97 C 2715, 1998 WL 781118, at *11 (N.D. Ill. Nov. 4, 1998).

[12]     To the extent that Crocs's management ordered shipments to remain in transit and moved 400,000 shoes to Rotterdam in order to reduce the amount of inventory included in the physical count, management's deceptive tactics would not support a finding that Deloitte acted recklessly. *See Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 314 (4th Cir. 2009) (discerning no strong inference of scienter where the auditor was "attempting to ensure" that the company was in compliance, but was deceived by the company's production of falsified documents).

consumers. However, ARB 43 cautions that "judgment should always be exercised and no loss shall be recognized unless the evidence indicates clearly that a loss has been sustained." Aplee.'s Supp. App. at 407 (Fin. Accounting Standards Bd. Accounting Standards, dated June 1, 2008).

Courts are not well-situated to second-guess an auditor's "complex and subjective professional judgments," *N.M. State Inv. Council*, 641 F.3d at 1097 (quoting *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1197 (C.D. Cal. 2008)), and we certainly cannot conclude that it would have been pellucid to Deloitte that the existence of unsalable and defective shoes in Crocs's inventory meant that the value of its *entire* inventory should be written down. *See, e.g.*, *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014) (declining to find that an auditor behaved recklessly because an alleged accounting error "was not especially obvious, at least with respect to the [c]ompany's financial bottom-line"); *Dronsejko*, 632 F.3d at 667 (holding that the auditor's resolution of an ambiguous auditing standard did not support a finding of recklessness).

Ultimately, considered "in its entirety," *Gold Res. Corp.*, 776 F.3d at 1108 (quoting *Tellabs*, 551 U.S. at 322), the complaint paints a picture of a rapidly growing company with increasing inventory, some of which was useless, and an outdated method of tracking its stock on a real-time basis. But even if Crocs's expansion, "juxtaposed with its archaic accounting and internal control systems,"

29

Aplt.'s Supp. Br. at 5, created a risk that the company's finances would be incorrectly reported, these are not the sort of highly suspicious "in your face facts" that would "cry out" that the company's inventory value or financial controls were fraudulently misrepresented, *N.M. State Inv. Council*, 641 F.3d at 1103 (quoting *In re Oxford Health Plans, Inc., Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999)), such that Deloitte must have taken notice.

Far more blatant misconduct is necessary before we would infer that Deloitte refused to see the obvious. *See, e.g.*, *Garfield*, 466 F.3d at 1268–69 (holding that corporation's increase of "its allowance for doubtful accounts" to "nearly seven times the average" was not "so irregular" that the auditor should have been on notice of fraud); *DSAM Global Value Fund*, 288 F.3d at 390 (concluding that auditor's approval of the company's recognition of revenue despite the fact that there was "no signed, fixed agreement," the "fee was not fixed," and the corporation still had "significant obligations to perform," did not constitute "deliberate recklessness or conscious misconduct"); *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 675 (3d Cir. 2002) (concluding that auditor's failure to account for four million dollars' worth of "intercompany balances . . . suggest[ed] nothing more than simple error, at best approaching negligence"); *cf. Suprema Specialties, Inc.*, 438 F.3d at 280–81 (holding that indicators of fraud were obvious where the company "restricted [the auditor's] access to key accounting

30

personnel" and checks to various suppliers were "deposited into the same account from which a purported customer . . . wrote checks back to" the company).[13]

---

[13]    Plaintiffs liken the allegations in their complaint to those in *In re Oxford Health Plans, Inc., Securities Litigation*, 51 F. Supp. 2d 290 (S.D.N.Y. 1999), but that case is distinguishable.  There, the district court found persuasive the plaintiffs' allegation that the auditor "recklessly disregarded, or outright ignored, blatant evidence of Oxford's extreme accounting irregularities, particularly Oxford's complete lack of internal controls and utterly ineffective computer system."  51 F. Supp. 2d at 294.  Yet in that case, the company's fraudulent practices were plainly evident: at the time of the audits at issue, the company was being investigated by both the New York State Insurance Department ("NYSID") and the New York Attorney General's office for misconduct related to its accounting system.  *See id.* at 295.  Indeed, the NYSID had already found the company's internal controls severely deficient six years before the audits, and "quickly determined" that the company "had not remedied any of the internal control problems [previously] found by the NYSID."  *Id.* at 293.  Notably, in contrast, the complaint here does not allege that Crocs's accounting practices had previously been investigated by regulators; so, this significant factor—that patently should have put the auditor in *Oxford Health Plans* on notice of accounting irregularities—could not have served to tip Deloitte off to the the potential inadequacy of Crocs's daily inventory management system.

For similar reasons, Plaintiffs' reliance on *In re Longwei Petroleum Investment Holding Ltd. Securities Litigation*, No. 13 CV 214(HB), 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014), is unavailing.  There, the district court stated that the auditors, at a minimum, reviewed the company's financial statements, which would have revealed "record revenues, [a] sudden upward trajectory, and [an] undisclosed tourism investment.  These data points alone should have prompted further investigation."  2014 WL 285103, at *6.  In contrast, here, a deficient system for tracking inventory would not have so obviously indicated to Deloitte that Crocs's inventory was overvalued—especially under an accounting principle that explicitly cautions that "judgment should always be exercised" and that losses should only be recognized if there is clear evidence to this effect.  Aplee.'s Supp. App. at 407.

## 3

Thus, weighing the averments of culpable scienter Plaintiffs advance against the competing inference of non-fraudulent intent, *see Tellabs*, 551 U.S. at 314, Plaintiffs have failed to allege a "strong inference" that Deloitte acted recklessly in auditing Crocs's finances and internal controls. While an outdated inventory management system, increasing inventory, and a growing number of unsalable or defective shoes may have been indicators that Crocs's inventory figures were dubious, the complaint does not sufficiently allege that either Deloitte knew of these warning signs, or that the signs were so clearly evident that Deloitte's failure to take heed was an "egregious refusal to see the obvious." *N.M. State Inv. Council*, 641 F.3d at 1098 (quoting *In re Software Toolworks Inc.*, 50 F.3d at 628). Indeed, the more compelling inference to be drawn from these facts is one of negligence on Deloitte's part. Consequently, Plaintiffs' complaint clearly falls short of the "high standard" for culpable scienter imposed by securities law. *Dronsejko*, 632 F.3d at 668.

## IV

Finally, Plaintiffs claim that the district court should have given them leave to amend their complaint. We review the denial of leave to amend a complaint for an abuse of discretion, *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 (10th Cir. 2013), and require that such a request "give adequate notice to the district court and to the opposing party of the basis of the proposed amendment,"

32

*Hall v. Witteman*, 584 F.3d 859, 868 (10th Cir. 2009) (quoting *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1186–87 (10th Cir. 1999)). Without this information, a district court need not independently determine whether grounds justifying an amendment exist. *See Calderon*, 181 F.3d at 1187.

Plaintiffs point to only one place in the record as articulating their basis for seeking leave to amend; it is a footnote in their response to the defendants' motion to dismiss. There, Plaintiffs merely request "dismissal . . . without prejudice to the filing of an amended complaint" but do not offer any hints of what such an amendment might contain. Aplee.'s Supp. App. at 416 n.76 (Pls.' Resp. to Defs.' Mots. to Dismiss, filed June 4, 2009). While, on appeal, Plaintiffs claim that they explained to the district court that the defendants had sought "to silence their ex-employees by use of non-disclosure agreements," *id.*, this argument was raised as a reason to lift the discovery stay imposed by the PSLRA, and *not* as a reason for why they should be allowed to amend their complaint.

Thus, because Plaintiffs did not offer any details that would have provided "notice to opposing parties and to the court of . . . the particular basis for the amendment," *Calderon*, 181 F.3d at 1186, the district court did not abuse its discretion in denying leave to amend the complaint.

**V**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.


ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge